Paul Hessler
Aaron Javian
Robert H. Trust
LINKLATERS LLP
1345 Avenue of the Americas
New York, NY 10105
(212) 903 9000 (Tel)
(212) 903 9100 (Fax)

Counsel to Scott Egan
as Petitioner and Foreign Representative

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re* | |
| Towergate Finance plc, | Chapter 15 |
| Debtor in a Foreign Proceeding. | Case No. 15-_____ (__) |

## VERIFIED PETITION UNDER CHAPTER 15 FOR
## RECOGNITION OF A FOREIGN MAIN PROCEEDING AND OTHER RELIEF

Scott Egan, in his capacity as the foreign representative (the "**Foreign Representative**")

of the above-captioned debtor (the "**Debtor**"), whose schemes of arrangement under part 26 of

the Companies Act 2006 of England and Wales (the "**English Proceeding**") are currently

pending before the Chancery Division (Companies Court) of the High Court of Justice of

England and Wales (the "**English Court**"), respectfully submits this verified petition

(the "**Petition**") for recognition of the English Proceeding as a "foreign main proceeding" and

for additional relief, under sections 1504, 1507, 1509, 1515, 1517 and 1521 of title 11 of the

United States Code, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**").

In support of the Petition, the Foreign Representative has filed contemporaneously

herewith the (a) Declaration of Scott Egan in Support of the Verified Petition under Chapter 15

for Recognition of a Foreign Main Proceeding and Other Relief (the "**Egan Declaration**") and (b) the Declaration of Bruce Bell in Support of the Verified Petition under Chapter 15 for Recognition of a Foreign Main Proceeding and Other Relief (the "**Bell Declaration**"), each of which is incorporated herein by reference.

## PRELIMINARY STATEMENT

1.    The Debtor, an English public limited company, has issued secured and unsecured debt that it seeks to adjust through two separate but related schemes of arrangement to be approved by the affected creditors and ultimately by the English Court under part 26 of the Companies Act 2006 of England and Wales (the "**Companies Act**").  In order to mitigate the risk of a dissenting creditor suing under the applicable indentures in U.S. courts to frustrate the Debtor's successful financial restructuring under the Schemes (as defined herein), the Foreign Representative files this Petition seeking this Court's aid in extending the protections granted by the English Court under the Schemes to the territorial jurisdiction of the United States.

2.    The Debtor's direct parent is Towergate Holdings II Limited (the "**Parent**"), a private company incorporated under the laws of England and Wales. Through a series of intermediate holding companies, the Debtor and the Parent are ultimately owned by Towergate Partnershipco Limited, another private company incorporated under the laws of England and Wales.  Towergate Partnershipco Limited in turn is owned by investment funds managed by the private equity firm Advent International Corporation ("**Advent**") and individual shareholders. Towergate Partnershipco Limited and its direct and indirect subsidiaries (including the Debtor and the Parent) comprise the corporate group known as "**Towergate**" or the "**Group**".

3.    Towergate is the leading independently-owned insurance intermediary company distributing general insurance products in the United Kingdom (the "**U.K.**") through its own brokers and third party brokers, including mortgage brokers and other mortgage intermediaries.

2

Towergate's corporate headquarters are located in Kent, England, and it has more than 90 offices across the U.K.  Towergate does not currently have any operations outside of the U.K.  The Debtor's only asset outside of the U.K. is a retainer provided to its U.S. counsel prior to the filing of the Petition.

4.      Towergate's trading performance since mid-2014, coupled with the significant risk that it may have material liabilities under certain ongoing regulatory investigations into its historic business practices, has resulted in the Group facing financial difficulties, particularly in light of the Debtor's debt service obligations.  As a result, the Debtor has, since November 2014, been in negotiations with its key creditor constituencies and other stakeholders with a view to restructuring its capital structure and financial obligations.  On February 2, 2015, the Debtor, which relies on cash generated by its operating subsidiaries to service its debt, did not make an interest payment due on that day in respect of certain of its senior secured notes.

5.      The Group's negotiations with an *ad hoc* group of senior secured creditors and an *ad hoc* group of senior unsecured noteholders recently resulted in an agreed framework for a financial restructuring that, if approved by at least the senior secured creditors and, if applicable, its senior unsecured noteholders, will be implemented through the Schemes. Only two classes of the Debtor's creditors – its Existing Senior Secured Creditors and its Existing Senior Unsecured Noteholders (each as defined herein) – will have their rights affected by, and will vote on, the relevant Scheme. As of the date hereof, holders of approximately 86.2% of the Existing Senior Secured Debt (as defined herein) and holders of approximately 86.9% of the Existing Senior Unsecured Notes (as defined herein) have entered into a lockup and restructuring agreement with the Debtor pursuant to which they have agreed to vote in favor of their respective Schemes.

3

6.      The Debtor thus expects each of the Schemes to be approved by each of the applicable classes of debt. This scenario is referred to in the Scheme documents and herein as the "**Composite Restructuring**." Under the Composite Restructuring, the senior secured creditors will, in consideration for the release and discharge of the Debtor's Existing Senior Secured Debt, receive a combination of cash, new debt, equity interests in a new holding company ("**TopCo**") and the right to subscribe for new super senior debt and participate in a back-stopped offering of shares in TopCo. The Existing Senior Unsecured Noteholders will, in consideration for the release and discharge of the Debtor's Existing Senior Unsecured Notes, receive equity interests in a new holding company controlled by the Existing Senior Unsecured Noteholders that will be a shareholder in TopCo and the right to participate in a back-stopped offering of shares in TopCo.

7.      However, if the Senior Secured Scheme (as defined herein) is approved by the Existing Senior Secured Creditors but the Parallel SUN Scheme (as defined herein) is not approved by the Existing Senior Unsecured Noteholders (or certain other conditions do not occur), the Composite Restructuring toggles to an alternative restructuring between the Debtor and the Existing Senior Secured Creditors. This scenario is referred to in the Scheme documents and herein as the "**Senior Secured Restructuring.**" Under the Senior Secured Restructuring, the Existing Senior Secured Creditors will, in consideration for the release and discharge of the Debtor's Existing Senior Secured Debt, receive the entire share capital in TopCo, and new senior secured and subordinated debt and the right to subscribe for new super senior debt. In this scenario, the guarantees granted by the Debtor's Parent and its subsidiaries in respect of the Existing Senior Unsecured Notes will be released in accordance with a contractual release mechanism in the Existing Intercreditor Agreement (as defined herein).

8.      In order to effectuate the restructuring contemplated by the Schemes, the Debtor, through its duly authorized, court-appointed Foreign Representative, herein seeks recognition of the English Proceeding as a foreign main proceeding and requests this Court grant full force and effect to the English Court's order approving the applicable Schemes. Pursuant to the indentures governing the senior secured notes and the senior unsecured notes, the Debtor has expressly consented to the jurisdiction of any federal or state court located in the Borough of Manhattan in the City of New York, New York in connection with any disputes arising out of the relevant indentures.   Thus, absent relief from this Court honoring the discharge and release of debts obtained in the Schemes, a dissenting noteholder in a class that has otherwise voted in favor of the Schemes could commence a lawsuit in the United States seeking to obtain more than its *pro rata* share of its class's distributions. For this reason, each of the Composite Restructuring and the Senior Secured Restructuring, if applicable, requires, as a condition precedent to its effectiveness,[1] that this Court enter the requested order granting recognition of the English proceeding and certain other related relief.

9.      As set forth herein, granting the requested relief is appropriate because, among other reasons, the English Proceeding is a foreign proceeding (as courts, including in this District, have consistently found in respect of English schemes), the Debtor's center of main interests is located in England and the Foreign Representative is a proper foreign representative. Moreover, the English Proceeding grants substantial due process rights to the Debtor's affected creditors that sufficiently protect their interests and is consistent with, and not manifestly contrary to, U.S. public policy.

---

[1]   Each of the Schemes contemplate the waiver of this condition if, among other things, recognition is not granted within four business days after the English Court approves the Schemes.

## BACKGROUND

### A.    Introduction to the Debtor and Towergate

#### 1.    The Debtor

10.    The Debtor is a public limited company incorporated under the laws of England and Wales. *See* Egan Declaration ¶ 6. Its registered office is located at Towergate House, Eclipse Park, Sittingbourne Road, Maidstone, Kent, England ME14 3EN. *Id.* The Debtor does not engage in any operating activities, but functions rather as a financing vehicle for the Group by issuing secured and unsecured debt and then lending the corresponding proceeds to the Group's operating subsidiaries. *Id.* The Debtor's principal assets are (a) its 100% equity interest in Towergate Insurance Limited, which in turn directly and indirectly owns the Group's operating subsidiaries and (b) certain intercompany loans owed by the operating subsidiaries. *See* Egan Declaration ¶ 7.

11.    Though the Debtor has no places of business in the United States, its existing indentures are governed by New York law. *See* Egan Declaration ¶ 8. In addition, the Debtor has expressly consented under its indentures to the jurisdiction of any federal or state court located in the Borough of Manhattan in the City of New York, New York. *Id.* The Debtor has appointed Corporation Services Company as its agent for service of process in actions arising out of its existing indentures or the transactions contemplated thereby. *Id.* Moreover, some of the Existing Senior Secured Creditors and the Existing Senior Unsecured Noteholders likely have connections to or, are based in, the United States. *Id.*

12.    The Debtor owns funds in an undrawn retainer with Linklaters LLP, the Debtor's U.S. counsel in connection with the filing of this chapter 15 case, which is being held in an interest-bearing client trust account with JPMorgan Chase Bank, N.A. in New York, New York (the "**Client Trust Account**"). *See* Egan Declaration ¶ 9. Pursuant to the terms of an engagement

letter between the Debtor and Linklaters LLP dated February 12, 2015, the Debtor deposited $49,965 in the Client Trust Account on February 17, 2015 and such funds remain in the Client Trust Account as of the date hereof. *Id.* Linklaters LLP is only permitted to apply the funds in the Client Trust Account to outstanding invoiced amounts with the Debtor's prior written consent. *Id.* The Debtor is the beneficiary of all interest that accrues on the funds in the Client Trust Account. *Id.*

### 2.    Towergate Group

13.    Towergate is the leading (as measured by gross written premium) independently-owned insurance intermediary company distributing general insurance products in the United Kingdom. *See* Egan Declaration ¶ 10. Since the Group was formed in 1997, it has made over 295 acquisitions, primarily of insurance underwriting agency and broker businesses, and has become the leading consolidator in the insurance intermediary market in the United Kingdom. *Id.* In 2013, the Group's operations handled approximately £3.1 billion of *pro forma* gross written premium which was in line with 2012. *Id.*

14.    The Group distributes insurance products through the Group's own brokers and third party brokers, including mortgage brokers and other mortgage intermediaries. *Id.* The Group also provides services to members of its broker network. The Group focuses on small- and medium-sized enterprises ("**SMEs**") in the commercial insurance market and on specialist personal insurance markets. *Id.* Due to the breadth of its operations, the Group performs many of the roles in the insurance supply chain other than the provision of capital in respect of insurance claims. *Id.* The Group does not incur any underwriting risk at any stage of the process and therefore has limited regulatory capital requirements. *Id.*

15.    Towergate operates through five principal business segments: (i) the insurance brokers business; (ii) the direct business, (iii) the underwriting business; (iv) the "paymentshield"

business and (v) the network business. *See* Egan Declaration ¶¶ 12-17. The Group's insurance intermediary and certain of its financial services activities are regulated by the UK Financial Conduct Authority (the "**FCA**") both as to business conduct and as to prudential matters. *See* Egan Declaration ¶ 18. The Group continues to be in discussions with the FCA in relation to past advice provided by the Towergate Financial business in the context of the FCA's more general investigations into: (i) the suitability of bulk pension transfer advice provided by financial advisers where employers offered an enhancement to the transfer value ("**ETV**") available to incentivize current and former employees to leave their existing defined benefit pension schemes; and (ii) the promotion of Unregulated Collective Investment Schemes ("**UCIS**") to retail clients, the advice provided by firms as to the suitability of UCIS and the adequacy of firms' systems and controls to support their UCIS activities. *See* Egan Declaration ¶ 34. Given the number of material uncertainties that continue to exist, it is not yet possible to make a reliable estimate of the Group's ultimate liability in connection with these investigations. *See* Egan Declaration ¶ 35.

16.     However, following advice received, the Group's working estimate (for the purposes of business planning) of potential redress costs for ETV and UCIS in aggregate, including costs and expenses is between £65 million to £85 million (though ultimate liability for ETV and UCIS may be materially different to this range).[2] *Id.*

17.     Towergate's corporate headquarters are located in Kent, England. *See* Egan Declaration at ¶ 6. Towergate has more than 90 offices across the U.K. *See* Egan Declaration

---

[2]     This estimate does not include any recoveries that may be available from relevant third parties and under the Group's insurance arrangements, both of which the Group continues to pursue, and the timing and extent of such recoveries remains unclear. This is an issue on which the FCA has been focusing, and the Group has estimated in its cashflows that the aggregate redress costs will need to be funded in due course following the Senior Secured Restructuring or the Composite Restructuring.

¶ 10. Towergate (excluding the Debtor) does not have operations or assets outside of the U.K. or within the territorial jurisdiction of the United States. *See* Egan Declaration ¶ 6.

**B.    The Debtor's Capital Structure.**

18.    As of January 30, 2015, the Debtor had outstanding indebtedness of approximately £1,050,131,849. *See* Egan Declaration ¶ 19. The Debtor's secured indebtedness consists of two New York law governed senior secured note issuances (the Existing SSNs and the Existing FRNs), as well as a secured revolving facility agreement (the Existing RCF). *Id.* The Debtor is also issuer in respect of certain senior unsecured notes due 2019 (the Existing Senior Unsecured Notes). *Id.* As set forth in more detail herein, obligations under the Existing SSNs, the Existing FRNs and the Existing RCF and, if requisite approvals are obtained, the Existing Senior Unsecured Notes will be released and discharged in connection with the Composite Restructuring. *See* Egan Declaration ¶¶ 66-68.

**1.    The Existing SSNs**

19.    The Debtor is the issuer of £233,980,000 8.5% senior secured notes due 2018 (the "**Existing SSNs**") pursuant to a New York law governed indenture dated February 11, 2011 between, among others, the Parent, as guarantor, the Debtor, as issuer, Lloyds Bank plc, as security agent, and The Bank of New York Mellon, London Branch, as trustee (in such capacity, the "**Existing SSN Trustee**") (as amended, supplemented and/or restated from time to time, the "**Existing SSN Indenture**"). *See* Egan Declaration ¶ 20. As of January 30, 2015, the total principal outstanding was £233,980,000 under the Existing SSNs. *Id.* The holders of the Existing SSNs are referred to herein as the "**Existing SSN Noteholders**."

**2.    The Existing FRNs**

20.    The Debtor is the issuer of £396,000,000 floating rate senior secured notes due 2018 (the "**Existing FRNs**") pursuant to an indenture dated May 10, 2013 between, among

others, the Parent, as guarantor, the Debtor, as issuer, Lloyds Bank plc, as security agent, and The Bank of New York Mellon, London Branch, as trustee (in such capacity, the "**Existing FRN Trustee**") (as amended, supplemented and/or restated from time to time, the "**Existing FRN Indenture**"). *See* Egan Declaration ¶ 21. As of January 30, 2015, the total principal outstanding was £396,000,000 under the Existing FRNs. *Id.* The holders of the Existing FRNs are referred to herein as the "**Existing FRN Noteholders**".

### 3.  The Existing RCF

21.    The Debtor is a borrower under a certain £85,000,000 revolving credit facility agreement dated May 9, 2013 with, among others, the Parent as guarantor, Lloyds Bank plc as security agent and as agent (in such capacity, the "**RCF Agent**")[3] and the lenders in connection therewith from time to time (the "**RCF Lenders**") (as amended, supplemented and/or restated from time to time, the "**Existing RCF**" and, together with the Existing SSNs and the Existing FRNs, the "**Existing Senior Secured Debt**"). *See* Egan Declaration ¶ 22. Loans under the Existing RCF mature on November 15, 2017 and bear interest at rates per annum equal to LIBOR, or in relation to any loan in Euro, EURIBOR plus 4.50%. *Id.* As of January 30, 2015, the total principal outstanding was £85,000,000 under the Existing RCF. *Id.* The existing RCF Lenders as at the date of the Scheme, together with the Existing SSN Noteholders and the Existing FRN Noteholders are referred to herein, collectively, as the "**Existing Senior Secured Creditors**".

### 4.  The Existing Senior Unsecured Notes

22.    The Debtor is the issuer of £304,593,000 senior unsecured notes due 2019 (the "**Existing Senior Unsecured Notes**") pursuant to an indenture dated February 11, 2011 between,

---

[3]    It is expected that Global Loan Agency Services Limited will become the successor RCF Agent shortly after the date hereof.

amongst others, the Parent, the Debtor and The Bank of New York Mellon, London Branch, as trustee (in such capacity, the "**Existing SUN Trustee**")[4] (as amended, supplemented and/or restated from time to time, the "**Existing Senior Unsecured Notes Indenture**"). *See* Egan Declaration ¶ 24. As of January 30, 2015, the total principal outstanding was £304,593,000 under the Existing Senior Unsecured Notes. *Id.* The holders of the Existing Senior Unsecured Notes are referred to herein as the "**Existing Senior Unsecured Noteholders**" and, together with the Existing Senior Secured Creditors, the "**Scheme Creditors**").

23.    Obligations under the Existing Senior Unsecured Notes will only be released and discharge in connection with the Composite Restructuring if the Parallel SUN Scheme is also supported by the requisite majorities and approved by the English Court in the English Proceeding. *See* Egan Declaration ¶¶ 66-68.

### 5.    Guarantees and Collateral

24.    The Existing SSNs, the Existing FRNs, the Existing RCF and the Existing Senior Unsecured Notes are irrevocably and unconditionally guaranteed on a joint and several basis by the Parent and certain of the Debtor's subsidiaries (the "**Subsidiary Guarantors**"; together with the Parent, the "**Guarantors**"). *See* Egan Declaration ¶¶ 20, 21, 22, 25. The guarantees rank *pari passu* among the Existing SSNs, the Existing FRNs, the Existing RCF and the Existing Senior Unsecured Notes, subject to the terms of the an intercreditor agreement (the "**Existing Intercreditor Agreement**"). *See* Egan Declaration ¶¶ 26-28.

25.    Security for the Existing SSNs, the Existing FRNs and the Existing RCF consists of pledges of all (or the majority of) the share capital of the Parent, the Debtor and the Subsidiary Guarantors and substantially all the other tangible and intangible assets of the Parent, the Debtor

---

4    Wilmington Savings Fund Society, FSB became the successor Existing SUN Trustee shortly before the date of this Petition.

and the Subsidiary Guarantors. *See* Egan Declaration ¶ 23. The liens securing each series of secured debt rank *pari passu*, subject to the terms of the Existing Intercreditor Agreement. *Id.*

**II.    Events Giving Rise to the English Proceeding.**

26.    As set forth in the Egan Declaration, the Group's trading performance since mid-2014, coupled with the significant risk that it may have material liabilities relating to the ongoing FCA investigations into its historic business practices, has resulted in the Debtor and the Group facing financial difficulties particularly in the context of the Debtor's debt service obligations. As a result, the Debtor has, since November 2014, been in negotiations with its creditors and other stakeholders with a view to restructuring its capital structure and financial obligations. *See* Egan Declaration ¶ 29.

27.    On February 2, 2015, the Debtor failed to make an interest payment due under the Existing FRNs and, as further set forth below, it does not expect to make such payment absent a balance sheet restructuring. *See* Egan Declaration ¶ 37. Therefore, the Debtor requires a restructuring of its capital structure in order to provide a tenable platform upon which Towergate can continue operating its business. *See* Egan Declaration ¶ 38. Notwithstanding the aforementioned non-payment, the Debtor's Existing Senior Secured Creditors, to date, have continued to support the Debtor and a restructuring of its debt obligations. *See* Egan Declaration ¶¶ 56, 57, 61-65.

**III.    Financial Restructuring Efforts Prior to Commencement of the English Proceeding.**

28.    Towergate initially sought to address these constraints and the resulting potential liquidity shortfall through disposals of non-core businesses and certain other management actions. *See* Egan Declaration ¶¶ 30, 31, 36. As such, the Debtor successfully disposed of its Hayward Aviation Limited subsidiary in late December 2014. *See* Egan Declaration ¶ 36. However, it has since become apparent to Towergate that further non-core disposals will be

insufficient to address its liquidity issues and unsustainable leverage. *See* Egan Declaration ¶¶ 37-39. The Group is considering the disposal of the Towergate Financial business, seeking to complete by the end of February 2015. *See* Egan Declaration ¶ 13.

29.    As set forth in the Egan Declaration, the Debtor has been pursuing other options, including potential M&A transactions, on a parallel path with its negotiations with key creditor constituencies. *See* Egan Declaration ¶¶ 42-48. However, the Debtor determined not to pursue an M&A transaction as the indicative bids received from two potential purchasers included a value range that would indicate ultimate recoveries lower than the liabilities currently owed to the Existing Senior Secured Creditors. *See* Egan Declaration ¶ 46.

30.    For this reason, the Debtor has been working extensively with its creditors over the last several months to reach agreement on a consensual restructuring of its debt obligations. *See* Egan Declaration ¶ 29. To this end, the Debtor hired legal counsel in fall 2014 to structure and negotiate a balance sheet restructuring. *Id.* The Debtor has engaged with its secured and unsecured creditor classes, with the ultimate goal of implementing a restructuring supported by both the Existing Senior Secured Creditors and the Existing Senior Unsecured Noteholders. During these negotiations separate *ad hoc* committees representing approximately 65% and 63% of the Existing Senior Secured Creditors (the "**Secured Ad Hoc Committee**") and the Existing Senior Unsecured Noteholders (the "**Unsecured Ad Hoc Committee**"), respectively, were formed and have been represented by separate legal counsel. *See* Egan Declaration ¶¶ 49, 53.

31.    The Debtor received multiple financial restructuring proposals from each of the *ad hoc* groups. *See* Egan Declaration ¶¶ 51, 52. After due consideration, the Debtor rejected two separate proposals from the Unsecured Ad Hoc Committee. *Id.* The Debtor and its advisors also engaged in restructuring negotiations with the Secured Ad Hoc Committee. On or about January

30, 2015, the Debtor and the obligors under the Existing Senior Secured Debt entered into a lock-up and restructuring agreement (the "**Senior Secured Lock-up Agreement**") with Existing Senior Secured Creditors holding over 70% of the total outstanding Existing Senior Secured Debt, pursuant to which such Existing Senior Secured Creditors have agreed, among other things, to convert their debt claims into the Alternative New Senior Secured Notes, the New Subordinated Notes and the Alternative TopCo Shares (each as defined in the Egan Declaration) (the "**Senior Secured Restructuring**"), to be implemented by way of the Senior Secured Scheme (the "**Senior Secured Restructuring Proposal**").   *See* Egan Declaration ¶¶ 56-59. Under the Senior Secured Restructuring Proposal, the Existing Senior Unsecured Noteholders would not receive any return on account of the Existing Senior Unsecured Notes.

32.    On February 2, 2015, the Debtor announced the Senior Secured Restructuring Proposal.   *See* Egan Declaration ¶ 56. Shortly after the announcement, the Existing Senior Secured Creditors holding over 75% of the total outstanding Existing Senior Secured Debt (the "**Composite Senior Secured Creditors**") and certain Existing Senior Unsecured Noteholders holding approximately 65% of the outstanding Existing Senior Unsecured Notes (the "**Composite SUN Holders**") reached agreement on an overall restructuring of the Existing Senior Secured Debt and the Existing Senior Unsecured Notes.[5] *See* Egan Declaration ¶ 61. In particular, the parties (i) agreed to an alternative restructuring of the Existing Senior Secured Debt in tandem with a full equity conversion of the Existing Senior Unsecured Notes (the "**Composite Restructuring**"), to be implemented by way of separate schemes of arrangement under the Companies Act for the Existing Senior Secured Debt (the "**Senior Secured Scheme**") and the Existing Senior Unsecured Notes (the "**Parallel SUN Scheme**" and, collectively with the

---

[5]    As of the date hereof, 86.2% of the Existing Senior Secured Creditors and 86.9% of the Existing Senior Unsecured Noteholders have signed the Composite Lock-Up Agreement.

Senior Secured Scheme, the "**Schemes**") (the "**Composite Scheme Proposal**") and (ii) entered into a lock-up and restructuring agreement dated February 6, 2015 to this effect (the "**Composite Lock-Up Agreement**").  *See* Egan Declaration ¶¶ 62, 63. Accordingly, the Senior Secured Lock-up Agreement was amended and restated to enable the Existing Senior Secured Creditors to pursue the Composite Restructuring. *See* Egan Declaration ¶ 64.

33.    Under the Composite Lock-Up Agreement, the Composite Senior Secured Creditors and the Composite SUN Holders agreed that the Composite Scheme Proposal would proceed in parallel with the Senior Secured Restructuring Proposal. *See* Egan Declaration ¶¶ 66-69. The Composite Lock-Up Agreement further provided that if certain conditions were not met and the Composite Restructuring could not occur, the Senior Secured Restructuring Proposal would nevertheless proceed without any recovery for the Existing Senior Unsecured Noteholders. *See* Egan Declaration ¶¶ 70, 71.

## IV.    Implementation of the Composite Restructuring or the Senior Secured Restructuring

34.    The restructuring of the Debtor's debt obligations will be implemented either by way of the Composite Restructuring or the Senior Secured Restructuring. The Debtor considers the Composite Restructuring preferable because it provides for the participation of both the Existing Senior Unsecured Noteholders and the Existing Senior Secured Creditors in a restructuring solution to achieve a restructuring of the Group's capital structure that enables the Existing Senior Unsecured Noteholders to have the opportunity to benefit from the potential upside by acquiring part of the equity in the reorganized Group. *See* Egan Declaration ¶ 65.

35.    However, if the Senior Secured Scheme is approved by the Existing Secured Creditors and the Parallel SUN Scheme is not approved by the Existing Senior Unsecured Noteholders (or certain other conditions do not occur), the Composite Restructuring toggles to an

15

alternative Senior Secured Restructuring between the Debtor and the Existing Senior Secured Creditors. *See* Egan Declaration ¶ 72.

36.     A central tenet of the proposed restructuring is that the Senior Secured Scheme can only compromise Existing Senior Secured Debt and the Parallel SUN Scheme can only compromise Existing Senior Unsecured Notes. The Composite Restructuring requires the approval of both the Senior Secured Scheme by the Existing Senior Secured Creditors and the Parallel SUN Scheme by the Existing Senior Unsecured Noteholders because it compromises both classes of creditors, albeit in two separate but related Schemes. *See* Egan Declaration ¶ 62. If the Composite Restructuring is implemented by way of the Senior Secured Scheme and the Parallel SUN Scheme, the effect will be to release and discharge the Debtor's Existing Senior Secured Debt, together with all accrued interest, and to release and discharge each Existing Senior Unsecured Noteholder's existing debt claims against the Debtor. *See* Egan Declaration ¶¶ 73-75.

37.     Alternatively, the Senior Secured Restructuring only requires the approval of the Existing Senior Secured Creditors (and not the Existing Senior Unsecured Noteholders), as only the Existing Senior Secured Debt is compromised (and not the Existing Senior Unsecured Notes) by the Senior Secured Scheme in the Senior Secured Restructuring. *See* Egan Declaration ¶¶ 58-59. The Existing Senior Unsecured Noteholders will not be asked to vote on the Senior Secured Restructuring. If the Senior Secured Scheme implements the alternative Senior Secured Restructuring, the effect will also be to release and discharge the Existing Senior Secured Debt, together with all accrued interest up to (and including) the date of completion of the Senior Secured Restructuring. *See* Egan Declaration ¶¶ 76-78. The liabilities of the Guarantors to the Existing Senior Unsecured Noteholders will be released and discharged in connection with the

16

Senior Secured Restructuring, such release and discharge occurring by virtue of a mechanism in the Existing Intercreditor Agreement – which was agreed by the Existing Senior Unsecured Noteholders as a term of the Existing Senior Unsecured Notes – and not by virtue of any scheme approved by the English Court. *See* Egan Declaration ¶¶ 28, 78. The Foreign Representative is not seeking recognition of the releases of the Guarantors as it relates to the claims of the Existing Senior Unsecured Noteholders in the case of a Senior Secured Restructuring because such releases occur as a result of a distressed disposal in accordance with the Existing Intercreditor Agreement.

38.   Under the Composite Restructuring Proposal, each Existing Senior Secured Creditor and each Existing Senior Unsecured Noteholder (each in their capacity as such) will release pursuant to the relevant Scheme (i) any and all claims against the Towergate Partnershipco Limited, the Debtor and all subsidiaries of Towergate Partnershipco Limited (including each member of the Group immediately prior to the effective date of the restructuring), the advisers (in their capacity as such), the members of the ad hoc groups (in their capacity as such), the Information Agent (as defined herein) (in its capacity as such), the existing senior secured notes trustee (in its capacity as such), the new notes trustee (in its capacity as such), the escrow and settlement agent (in its capacity as such), and any other Scheme Creditor (or its nominated recipients or nominated participants), the prospective administrators, the administrators and the ad hoc groups and (ii) any and all of their claims against any current or former director of any of the Group entities that executes a deed of release in favor of the Group and the Scheme Creditors, in each case arising out of or in connection with the Scheme Claims (as defined in the explanatory statement), the negotiation and implementation of the Senior Secured Scheme (in respect of the Existing Senior Secured Creditors only), the Parallel SUN

17

Scheme (in respect of the Existing Senior Unsecured Noteholders only) and the Composite Restructuring, subject to a carveout for, among other things, fraud or wilful misconduct (collectively, the "**Scheme Releases**").[6] *See* Egan Declaration ¶ 75 and Exhibit B thereto (excerpts of applicable Scheme Releases). The Scheme Releases form an integral part of the bargain between the Debtor and the Scheme Creditors so as to achieve a consensual resolution of the financial difficulties of the Debtor, without recourse to an unplanned and non-consensual insolvency. *See* Bell Declaration ¶ 23.

39.    As more fully set forth in the Egan Declaration, the following table summarizes and compares the treatment of the claims of the Existing Senior Secured Creditors and the Existing Senior Unsecured Noteholders in the case of the Composite Restructuring and, alternatively, the Senior Secured Restructuring:

|  | **Composite Restructuring** | **Senior Secured Restructuring** |
|---|---|---|
| **Existing Senior Secured Creditors** (in each case, *pro rata* to the amount of Existing Senior Secured Debt held by each Existing Senior Secured Creditor) | (i) 16.67% of the post restructuring share capital of TopCo;[7]<br><br>(ii)  the right to subscribe to 2.69% of the post-restructuring share capital of TopCo for an aggregate subscription of approximately £9.7 million;<br><br>(iii) New senior secured notes issued by FinCo (as defined herein) in the amount of £425,000,000; | (i) 100.0% of the post restructuring share capital of TopCo together with accrued interest up to (and including) completion of the Senior Secured Restructuring;<br><br>(ii) new senior secured notes issued by FinCo in the amount of £375,000,000 together with accrued interest up to (and including) completion of the |

---

[6]    A similar release is contemplated in connection with the Senior Secured Scheme if the Composite Restructuring is not consummated.  In such circumstances, only the Existing Senior Secured Creditors would be granting such release (and the Existing Senior Unsecured Noteholders, the Unsecured Ad Hoc Committee and their advisors would be excluded from being released parties).

[7]    Approximately 11.11% of the post-restructuring share capital of TopCo will be distributed ratably in proportion to the amount of Existing Senior Secured Creditor and approximately 5.56% of the post-restructuring share capital of TopCo will be distributed ratably in proportion to the amount of accrued interest owed to each Existing Senior Secured Creditor as at (and including) the date of completion of the Composite Restructuring.

| | | |
|---|---|---|
| | (iv) £250,000,000 in cash;<br><br>(v) receipt of an amount of cash equal to the excess of the accrued interest up to (and including) the completion date of the Composite Restructuring over £20,020,000; and<br><br>(vi)  the opportunity to participate (backstopped by certain members of the Secured Ad Hoc Committee) in the issuance on closing of the Composite Restructuring of £75,000,000 floating rate super senior secured notes due 2020 by FinCo. | Senior Secured Restructuring; and<br><br>(iii) new subordinated notes issued by MidCo (as defined herein) in the amount of £150,000,000 together with accrued interest up to (and including) completion of the Senior Secured Restructuring. |
| **Existing Senior Unsecured Noteholders** (in each case, *pro rata* to the amount of Existing Senior Unsecured Notes held by each Existing Senior Unsecured Noteholder) | (i) The right to subscribe indirectly and directly for 80.65% of the post restructuring share capital of TopCo for an aggregate subscription price of approximately £290.3 million;[8] and<br><br>(ii) entitled to an allocation of class A ordinary shares (the "**A Shares**") in NewCo which will rank behind the Preference Shares, subject to dilution. | Contractual release of claims against Parent and Subsidiary Guarantors under the Existing Intercreditor Agreement.[9] |

---

[8]    Such subscription rights will take the form of (i) a right to subscribe for B preference shares (bearing a 15% PIK dividend and a right to dividends and distributions ranking prior to the A Shares) (the "**Preference Shares**") in a "**NewCo**" to be formed in connection with the restructuring (which will own a newly formed company "**MidCo**", which will in turn own a newly formed company "**FinCo**") that will hold 55.56% of the post-reorganization equity in TopCo and include "stapled" penny warrants for 20% of the A Shares post exercise.

[9]    As noted in the body of this Petition, this Petition does not seek the Court's recognition of the contractual release of the Existing Senior Unsecured Notes claims under the Existing Intercreditor Agreement.  That occurs as a matter of contract between the Existing Senior Unsecured Noteholders and the Existing Senior Secured Creditors.

40.     Except for the debt obligations that are contemplated to be adjusted under the Senior Secured Scheme or the Parallel SUN Scheme as set forth above, the Debtor's (and the Group's) other liabilities will be unaffected by the Schemes. *See* Egan Declaration ¶ 83. The Group intends to pay and honor all outstanding obligations to their customers, vendors and employees in the ordinary course of business, including paying any trade claims as and when such claims fall due. *Id.*

## V.      Commencement of the English Proceeding under Part 26 of the Companies Act

41.     On February 6, 2015, the Debtor proposed each Scheme seeking to effectuate the restructuring; a copy of the Scheme proposals are attached hereto as **Exhibit B**.  The documents accompanying the Schemes contemplate that the Debtor may seek recognition thereof under chapter 15 of the Bankruptcy Code.  If the Schemes do not become effective, the Debtor would be unable to honor obligations under the Existing Senior Secured Debt and the Existing Senior Unsecured Notes if those obligations are accelerated. *See* Egan Declaration ¶¶ 91-93.

42.     Each Scheme can become legally binding only upon the following:

   a) a vote in favor of the Scheme by a majority in number representing not less than 75% in value of the applicable voting creditors at meetings specially convened at the direction of the English Court (the "**Scheme Meetings**");

   b) the issuance by the English Court of an order sanctioning the Scheme (the "**Sanctioning Order**"); and

   c) delivery of the Sanctioning Order  to the Registrar of Companies in England and Wales (the "**Companies House**") for registration.

*See* Bell Declaration ¶¶ 15-20.

43.     The Composite Restructuring will become effective upon the satisfaction of the conditions outlined above and the satisfaction of certain other conditions (including regulatory approvals) set forth in the Composite Restructuring documents and the Senior Secured

Restructuring will become effective upon the satisfaction of the conditions outlined above and the satisfaction of certain other conditions (including regulatory approvals) (such effective date as defined in the Senior Secured Scheme, the "**Relevant Effective Date**").

44.    By letters dated February 6, 2015 (collectively, the "**Letters**"), the Debtor notified the Scheme Creditors, the RCF Agent, the Existing SSN Trustee, the Existing FRN Trustee and the Existing SUN Trustee, that the Debtor was issuing the documents relating to the Schemes to the English Court to commence the Schemes. *See* Egan Declaration ¶¶ 84-87. On February 12, 2015, the Debtor notified the Scheme Creditors, the RCF Agent, the Existing SSN Trustee, the Existing FRN Trustee and the Existing SUN Trustee the date, time and location of the convening hearings (the "**Convening Hearings**") regarding the Schemes. *See* Egan Declaration ¶ 88. On February 18, 2015, the Debtor notified the Scheme Creditors, the RCF Agent, the Existing SSN Trustee, the Existing FRN Trustee and the Existing SUN Trustee the revised date and time of the Convening Hearings. *Id.* On March 6, 2015, the English Court conducted the Convening Hearings, whereby the English Court entered two orders directing the convening of the Scheme Meetings for both the Existing Senior Secured Creditors and the Existing Senior Unsecured Noteholders respectively on March 24, 2015, and approving the appointment of the Foreign Representative (the "**Convening Order**"), a copy of each of which is attached hereto as **Exhibit C**. The Debtor and the Foreign Representative thereafter commenced this chapter 15 case.

45.    A notice of the Scheme Meetings, together with each Scheme, a proxy deed and an account holder deed (together with guidance notes for the completion of the voting form) for each Scheme, an explanatory statement for each Scheme, the Senior Secured Lock-up Agreement, the Composite Lock-up Agreement and the Letters have been made available to the

RCF Lenders via the RCF Agent and the Existing SSN Noteholders, Existing FRN Noteholders and Existing Senior Unsecured Noteholders via Link DFK Limited (the "**Information Agent**").

46.     Following the Scheme Meetings, and upon receiving the necessary votes in favor of the Composite Restructuring or, if the conditions to the Composite Restructuring are not met, the Senior Secured Restructuring, the English Court will conduct a hearing to consider sanctioning (*i.e.*, approval) of the Schemes on March 27, 2015 (the "**Scheme Sanction Hearing**"). The Debtor is seeking the relief requested herein be heard on or about the same date as the Scheme Sanction Hearing to coincide with the timing of the broader restructuring.

## JURISDICTION AND VENUE

47.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and the Amended Standing Order of Reference dated January 31, 2012, Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 1, 2012) (Preska, C.J.).

48.     This case has been properly commenced pursuant to section 1504 of the Bankruptcy Code by the filing of a petition for recognition of the English Proceeding under section 1515 of the Bankruptcy Code.

49.     Venue is proper in this District pursuant to 28 U.S.C. § 1410(1) as the Debtor's sole asset in the United States, in the form of the Client Trust Account, is located in this District.

50.     The statutory bases for relief are sections 1504, 1507, 1509, 1515, 1517 and 1521 of the Bankruptcy Code.

## RELIEF REQUESTED

51.     The Foreign Representative respectfully requests the entry of an order, substantially in the form attached hereto as **Exhibit A** (i) recognizing the English Proceeding as a "foreign main proceeding" under section 1517(a) of the Bankruptcy Code, (ii) finding that the

Foreign Representative is a "person" who meets the definitional requirements of section 101(24) of the Bankruptcy Code, (iii) finding that the Petition meets the requirements of section 1515 of the Bankruptcy Code, and (iv) granting additional relief under sections 1521 and 1507 of the Bankruptcy Code.

## I.   The Debtor is eligible to be a "debtor" under chapter 15 of the Bankruptcy Code

52.    The Debtor is an entity eligible to be a debtor in a chapter 15 case.  For the purposes of a case under chapter 15, a "debtor" means an entity that is the subject of a foreign proceeding. *See* 11 U.S.C. § 1502(1).  Here, the Debtor is a public limited company incorporated under the laws of England and Wales. *See* 11 U.S.C. §§ 101(15) and (41); *see* Egan Declaration ¶ 6.  As set forth below, the English Proceeding is a foreign proceeding as that term is defined in the Bankruptcy Code.

53.    Moreover, the Debtor is an eligible chapter 15 debtor under section 109(a) of the Bankruptcy Code. Section 109(a) requires that a debtor must either reside, have a domicile, a place of business or property in the U.S. 11 U.S.C. § 109(a); *see Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238 (2d Cir. 2013) (holding that section 109(a) applies to chapter 15 debtors). Courts in this District have required that the debtor have only a nominal amount of property in the U.S. to be eligible to file a chapter 15 case. *See In re Octaviar Admin. Pty Ltd.,* 511 B.R. 361, 372-73 (Bankr. S.D.N.Y. 2014) (holding cash in client trust account maintained by U.S. counsel to the foreign representative satisfied the section 109(a) requirement); *In re Globo Comunicacoes e Participacoes S.A.*, 317 B.R. 235, 249 (Bankr. S.D.N.Y. 2004) ("For a foreign corporation to qualify as a debtor under Section 109, courts have required only nominal amounts of property to be located in the United States, and have noted that there is 'virtually no formal barrier' to having federal courts adjudicate foreign debtors'

23

bankruptcy proceedings."); *In re Paper I Partners, L.P.*, 283 B.R. 661, 674 (Bankr. S.D.N.Y. 2002) ("There is no statutory requirement as to the property's minimum value."). In this case, the Debtor is an entity eligible to be a debtor because it has "property in the United States" in the form of the Client Trust Account placed in a bank located in New York, New York prior to the filing of the Petition. *See* Egan Declaration ¶ 9. Accordingly, the Client Trust Account established by the Debtor with its U.S. counsel satisfies the flexible standard for eligibility under section 109(a).

54.     Finally, the Debtor does not fall within any of the excluded categories of entities eligible for chapter 15 relief set forth in section 1501(c). Although section 1501(c) excludes certain entities from chapter 15 eligibility,[10] it does not exclude financing entities such as the Debtor that do not engage in any trade or business. *See* Egan Declaration ¶ 6. Accordingly, the Debtor is eligible for chapter 15 relief. *See* 11 U.S.C. § 1501(b) and (c).

## II.     The requirements for chapter 15 recognition are satisfied.

55.     The English Proceeding is entitled to recognition under chapter 15 of the Bankruptcy Code. Section 1517(a) of the Bankruptcy Code provides that, subject to section 1506 of the Bankruptcy Code discussed below, a court "shall" enter an order granting recognition of a foreign proceeding if:

> (1) such foreign proceeding is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502 of the Bankruptcy Code;
>
> (2) the foreign representative applying for recognition is a person or body; and

---

[10]   These exclusions are: (a) entities identified by exclusion in section 109(b), other than a foreign insurance company, (b) certain individuals who have debts within the limits specified in section 109(e) and (c) an entity subject to a proceeding under the Securities Investor Protection Act of 1970, a stockbroker subject to subchapter III of chapter 7 or a commodity broker subject to subchapter IV of chapter 7. 11 U.S.C. § 1501(c)(1)-(3).

(3) the petition meets the requirements of section 1515 of the Bankruptcy Code.

11 U.S.C. § 1517(a).    Section 1517(b) of the Bankruptcy Code provides that a foreign

proceeding "shall be recognized . . . (1) as a foreign main proceeding if it is pending in the

country where the debtor has the center of its main interests."  11 U.S.C. § 1517(b)(1).  Here, all

of the requirements for recognition of the English Proceeding as a foreign main proceeding are

satisfied for the reasons set forth below.

A.    **The English Proceeding constitutes a "Foreign Proceeding."**

56.    The English Proceeding is a "foreign proceeding" under chapter 15 of the

Bankruptcy Code.  Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as:

> [A] collective judicial or administrative proceeding in a foreign
> country, including an interim proceeding, under a law relating to
> insolvency or adjustment of debt in which proceeding the assets
> and affairs of the debtor are subject to control or supervision by a
> foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23). Based on this definition, courts have previously held that a "foreign

proceeding" is one:

a.    in which acts and formalities are set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice;

b.    that has either a judicial or an administrative character;

c.    that is collective in nature, in the sense that the proceeding considers the rights and obligations of all creditors;

d.    that is located in a foreign country;

e.    that is authorized or conducted under a law related to insolvency or the adjustment of debt, even if the debtor that has commenced such proceedings is not actually insolvent;

f.    in which the debtor's assets and affairs are subject to the control or supervision of a foreign court or other authority competent to control or supervise a foreign proceeding; and

25

g.    that is for the purpose of reorganization or liquidation.

*See Armada (Singapore) Pte Ltd. v. Shah (In re Ashapura Minechem Ltd.)*, 480 B.R. 129, 136 (Bankr. S.D.N.Y. 2012) (citing *In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009)); *see also In re Overnight & Control Comm'n of Avánzit, S.A.*, 385 B.R. 525, 533 (Bankr. S.D.N.Y. 2008) (discussing factors).

57.    Since Congress' enactment of chapter 15 of the Bankruptcy Code, bankruptcy courts in the Southern and Eastern Districts of New York have routinely recognized similar U.K. schemes as a "foreign proceeding." *See, e.g., In re New World Res. N.V.,* Case No. 14-12226 (SMB) (Bankr. S.D.N.Y. Sept. 9, 2014); *In re hibu Inc.,* Case No. 14-70323 (Bankr. E.D.N.Y. Feb. 27, 2014); *In re Zlomrex Int'l Fin. S.A.*, No. 13-14138 (SHL) (Bankr. S.D.N.Y. Jan. 31, 2014); *In re Magyar Telecom B.V.*, Case No. 13-13508 (SHL) (Bankr. S.D.N.Y. Dec. 11, 2013); *In re Castle Holdco 4, Ltd.*, Case No. 09-11761 (REG) (Bankr. S.D.N.Y. Apr. 22, 2009); *In re Global Gen. & Reinsurance Co. Ltd.*, Case No. 08-14939 (RDD) (Bankr. S.D.N.Y. Jan. 21, 2009); *In re ING Re (UK) Ltd.*, Case No. 08-10018 (REG) (Bankr. S.D.N.Y. Jan. 30, 2008).

58.    Numerous facts in the Egan Declaration and Bell Declaration support a finding that the English Proceeding constitutes a "foreign proceeding" for purposes of section 101(23) of the Bankruptcy Code.

59.    <u>First</u>, the English Proceeding is a proceeding commenced pursuant to part 26 of the Companies Act, an English law that governs corporate reorganizations and that is frequently used in a restructuring context. *See* Bell Declaration ¶¶ 1, 9; *see also In re Betcorp Ltd.*, 400 B.R. at 278 (a proceeding is characterized by "acts and formalities set down in law so that courts, merchants and creditors can know them in advance and apply them evenly in practice").

60.    <u>Second</u>, the English Proceeding is "judicial," as it has been commenced before the English Court and thereafter is subject to the supervision of such court. *See* Bell Declaration

26

¶ 13. The English Court entered the Convening Order to commence the English Proceeding, and the Schemes must be approved by the English Court for them to be effective. *See* Bell Declaration ¶¶ 17-20, 24. The English Court is a judicial body of the U.K., which under the Schemes will have exclusive jurisdiction to hear and determine any suit, action or proceeding and to settle any dispute arising out of any provision of the Schemes. *See, e.g.*, Bell Declaration ¶ 10-24. Thus, the English Court will supervise the affairs of the Debtor in connection with the Schemes. *Id.*

61.     <u>Third</u>, the English Proceeding is collective in nature in that it directly involves all Scheme Creditors and requires approval by a majority in number of the voting Scheme Creditors representing at least 75% in amount of the Scheme claims voted in order for the any of the Schemes to proceed. *See* Bell Declaration ¶ 15. The Schemes are intended to benefit creditors according to their interests collectively, rather than to benefit any single creditor alone. *See* Bell Declaration ¶ 8; *See Betcorp*, 400 B.R. at 281 (a proceeding is collective where such proceeding "considers the rights and obligations of all creditors" in contrast to a non-collective proceeding, such as a "receivership remedy instigated at the request, and for the benefit, of a single secured creditor"); s*ee also* Transcript of Recognition Hearing at 17:8-12, *In re Magyar Telecom B.V.*, No. 13-13508 (Bankr. S.D.N.Y. Dec. 11, 2013), ECF No. 30 (the "**Magyar Transcript**")[11] (finding a proceeding to approve a U.K. scheme arrangement to be "collective, as that terms is [defined] in a Chapter 15, as it directly involves all scheme creditors and requires approval by a majority, a number of the voting scheme creditors representing at least three-quarters in amount of the scheme claims.").

---

[11]    A copy of the Magyar Transcript is attached hereto as **Exhibit D**.

62.    <u>Fourth</u>, the English Proceeding is being administered by the English Court in London, England. *See* Bell Declaration ¶¶ 10-24.

63.    <u>Fifth</u>, as described above, part 26 of the Companies Act is an English law that governs, among other things, the adjustment of debt, as contemplated by the Schemes that the Debtor is seeking to have approved by the English Court in the English Proceeding. *See* Bell Declaration ¶¶ 1, 9; *see* Magyar Transcript at 17:17-18 (finding a U.K scheme of arrangement is "for the adjustment of debt, because it is between the debtor and a class of creditors").

64.    <u>Sixth</u>, following from part 26 of the Companies Act, the Debtor's assets and affairs are subject to the supervision of the English Court during the pendency of the English Proceeding. *See* Bell Declaration ¶¶ 10-24.

65.    <u>Finally</u>, the objective of the English Proceeding is to further the ultimate reorganization of Towergate. The business of the Group will effectively be transferred into the ownership of a new holding company or companies (as applicable) with a reorganized balance sheet while an administrator will be appointed over the Debtor to implement certain steps of the Composite Restructuring or the Senior Secured Restructuring (as applicable). *See* Egan Declaration ¶¶ 58, 59, 66-68. The Schemes submitted to the English Court will govern this global balance sheet restructuring of the Debtor's and the other Towergate obligors' debt obligations. *See* Bell Declaration ¶¶ 1, 2. As a consequence, the English Proceeding was commenced by the Debtor for the purpose of reorganization, as required by section 101(23) of the Bankruptcy Code.

66.    Accordingly, as all of the criteria required by section 101(23) are satisfied, this Court should find that the English Proceeding constitutes a "foreign proceeding" as required by section 1517 of the Bankruptcy Code.

**B.    The English Proceeding is a "Foreign Main Proceeding."**

67.    In addition to qualifying as a "foreign proceeding" under section 101(23), the English Proceeding clearly qualifies as a "foreign main proceeding,"[12] which is defined in the Bankruptcy Code as "a foreign proceeding pending in the country where the debtor has the center of its main interests."    *See* 11 U.S.C. § 1502(4); *see also* 11 U.S.C. § 1517(b)(1) (providing that an order of recognition as a foreign main proceeding shall be entered if the foreign proceeding that is subject to the petition "is pending in the country where the debtor has the center of its main interests"). The relevant time period to consider in determining the location of a debtor's "center of main interests" ("**COMI**") is the date on which the chapter 15 petition was filed. *See Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir. 2013).

68.    While the Bankruptcy Code does not expressly define COMI, it provides that in the absence of evidence to the contrary a foreign debtor's registered office is presumed to be its COMI. 11 U.S.C. § 1516(c); *see In re Tri-Continental Exch.*, 349 B.R. 627, 634 (Bankr. E.D. Cal. 2006) ("In effect, the registered office. . . is evidence that is probative of, and that may in the absence of other evidence be accepted as proxy for, 'center of main interest.'"). Here, the Debtor's registered office has been located in Kent, England since its formation in 2010. *See* Egan Declaration ¶ 6. Accordingly, the Debtor is entitled to the statutory presumption that England is its COMI.

---

[12]    Even if the English Proceeding is not recognized as a foreign main proceeding, it nonetheless should be recognized as a "foreign nonmain proceeding" pursuant to section 1517(b) of the Bankruptcy Code, which provides that a foreign proceeding shall be recognized as a foreign nonmain proceeding if it is pending in a country where the debtor has an establishment. 11 U.S.C. § 1517(b)(2). An "establishment" is defined as "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2). While the term "nontransitory activity" is not defined in the Bankruptcy Code, courts have interpreted it to mean "a local place of business." *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 131 (Bankr. S.D.N.Y. 2007), *aff'd* 389 B.R. 325 (S.D.N.Y. 2008).  It is clear that the Debtor has an establishment in the U.K. given that the entirety of its (and Towergate's) operations are located within the U.K.

69.     There should be no doubt that the Debtor's COMI is in the U.K.  The Debtor and the other companies in the Group: (a) were incorporated in the U.K., *see* Egan Declaration ¶ 6; (b) have all of their assets located in the U.K. other than the Client Trust Account recently placed in this District, *see* Egan Declaration ¶¶ 6, 7, 9; (c) conduct operations from 90 offices throughout the U.K., s*ee* Egan Declaration ¶ 10; (d) are managed from corporate headquarters located in England, *see* Egan Declaration ¶ 6; and (e) have customers located primarily in the U.K., *see* Egan Declaration ¶ 10. The existence of the Debtor's COMI in the UK has been public and therefore ascertainable by creditors and third parties. *See In re Fairfield Sentry Ltd.*, 714 F.3d 127, 130 (2d Cir. 2013) ("The relevant principle [to determine a debtor's COMI] is that COMI lies where the debtor conducts its regular business, so that the place is ascertainable by third parties . . . Among other factors that may be considered are the location of headquarters, decision-makers, assets, creditors, and the law applicable to most disputes.").

70.     In fact, the Debtor's COMI could not be any jurisdiction other than the U.K. because neither the Debtor nor any other company in the Group has any substantive connection whatsoever to any other jurisdiction besides the United States (to the extent of the Client Trust Account and the governing law and forum selection provisions in the applicable indentures) and the U.K.  *See* Egan Declaration ¶¶ 6-18; *see also In re British Am. Ins. Co.*, 425 B.R. 884, 912 (Bankr. S.D. Fla. 2010) ("The location of a debtor's COMI should be readily ascertainable by third parties."); *In re Ran,* 390 B.R. 257, 266 (Bankr. S.D. Tex. 2008) ("A debtor's centre of main interests must be identified by reference to criteria that are both objective and ascertainable by third parties.") (internal quotation marks omitted); Case C-341/04, *Bondi v. Bank of Am., N.A. (In re Eurofood IFSC Ltd.)*, 2006 WL 1142304 (E.C.J. May 2, 2006) (stating that the statutory presumption in favor of considering the situs of the debtor's registered office as its COMI could

be rebutted if criteria that are objective and ascertainable by third parties would lead to a different result).

71.    For these reasons, the English Proceeding should be recognized as a foreign main proceeding.

**C.    The Foreign Representative is a "Foreign Representative" as Defined in the Bankruptcy Code.**

72.    For recognition under chapter 15, a foreign proceeding must also have a foreign representative. *See* 11 U.S.C. § 1517(a)(2).

73.    The Foreign Representative submits that this chapter 15 case was commenced by a duly appointed and authorized "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code.  Section 101(24) of the Bankruptcy Code provides as follows:

> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

74.    The Debtor has commenced the English Proceeding and the English Court has approved the appointment of the Foreign Representative at the Convening Hearings on March 6, 2015.[13]  *See* **Exhibit B**.   Thus, the Foreign Representative has met the requirements of section 101(24) of the Bankruptcy Code and is the Debtor's "foreign representative" as defined thereunder.  *Cf. In re SPhinX, Ltd.*, 351 B.R. 103, 116-17 (Bankr. S.D.N.Y. 2006) *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007) (noting that the foreign representatives had submitted a "copy of the Cayman Court's order appointing them to administer the Debtors' winding up under the Companies Law

---

[13]    The Debtor's Board of Directors also adopted resolutions on March 5, 2015 appointing Mr. Egan as the Foreign Representative of the Debtor.  *See* Egan Declaration ¶ 3, note 1.

and authorizing their commencement of these chapter 15 cases, thereby satisfying Bankruptcy Code section 101(24)").

## VI.   The Debtor is Entitled to the Automatic Relief Under Section 1520 of the Bankruptcy Code

75.     Section 1520(a) of the Bankruptcy Code sets forth a series of statutory protections that automatically result from the recognition of a foreign proceeding as a foreign main proceeding, *see* 11 U.S.C. § 1520(a), including the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to the Debtor and to the Debtor's property that is located within the territorial jurisdiction of the United States. Given that the protections set forth in section 1520(a) flow automatically from the recognition of a foreign main proceeding under section 1517, the Foreign Representative respectfully submits that no further showing is required to the extent the Court recognizes the English Proceeding as a foreign main proceeding.

## VII.   Certain Additional Relief Upon Recognition is Both Necessary and Appropriate to Effect the English Proceeding and Should be Granted

76.     In addition to recognition of the English Proceeding as a foreign main proceeding, the Foreign Representative submits that any relief sought in the Petition that does not flow automatically from section 1520(a), including enforcement of the Scheme Releases and a permanent injunction to enjoin any Scheme Creditor from taking any action inconsistent with the Schemes, is proper under sections 1507 and 1521 of the Bankruptcy Code (the "**Discretionary Relief**").

77.     Upon recognition of a foreign proceeding, sections 1507 and 1521 of the Bankruptcy Code provide specific grounds for additional relief.  A court may  act under section 1507 to provide "additional assistance" to a foreign representative under the Bankruptcy Code or other U.S. law, provided that such assistance is "consistent with the principles of comity."  *See*

32

11 U.S.C. § 1507. Section 1521 authorizes the Court to grant "any appropriate relief," including

"any relief that may be available to a trustee" subject to certain limitations and provided that "the

interests of the creditors and other interested entities, including the debtor, are sufficiently

protected." 11 U.S.C. §§ 1521, 1522.

78.    Courts in this District have held that additional assistance is warranted if such

relief is consistent with the principles of comity under section 1507. *See In re Sino-Forest Corp.*,

501 B.R. 655, 664 (Bankr. S.D.N.Y. 2013) ("[R]elief post-recognition is largely discretionary

and turns on subjective factors that embody principles of comity.") (citations omitted); *see also*

*In re Metcalfe & Mansfield Alt. Invs. (In re Metcalfe)*, 421 B.R. 685, 696 (Bankr. S.D.N.Y.

2010) (holding that section 1507 provides basis to grant comity to non-debtor releases and

injunction provisions included in Canadian order entered in Canadian proceeding).

**A.     Enforcement of the Discretionary Relief and Scheme Releases is Permitted Under Section 1507 of the Bankruptcy Code**

79.    Section 1507 provides that if recognition is granted, a court may provide

"additional assistance" to a foreign representative. *See* 11 U.S.C. § 1507(a). In determining

whether to grant "additional assistance" section 1507 directs a court to consider principles of

comity and cooperation with foreign courts. *See also* 11 U.S.C. § 1509(b)(3); *In re Atlas*

*Shipping A/S*, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009) (holding that once a case is recognized

as a foreign main proceeding, chapter 15 specifically contemplates that the court will exercise its

discretion consistent with principles of comity); *Bear Stearns*, 389 B.R. at 333 (holding that

relief post-recognition is largely discretionary and turns on subjective factors that embody

principles of comity).

80.    In exercising discretion to grant relief under section 1507, courts will be guided

by the standards set forth in section 1507(b), which provides:

In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure –

(1) just treatment of all holders of claims against or interests in the debtor's property;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of the debtor;

(4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

(5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b).

81.    U.S. federal courts generally extend comity showing deference to a foreign court's judgment and relief therein when the foreign court has proper jurisdiction, the foreign court provides for a full and fair process, and enforcement does not contravene the laws or public policy of the U.S.  *See, e.g., Hilton v. Guyot*, 159 U.S. 113, 202-03 (1895) (holding that if the foreign forum provides a full and fair trial before a court of competent jurisdiction, conducting the trial upon regular proceedings and under a system of jurisprudence likely to secure an impartial administration of justice, and there is nothing to show prejudice in the court or in the system of laws under which it is sitting, the judgment should be enforced and not "tried afresh"); *In re Bd. of Dirs. of Hopewell Int'l Ins., Ltd.*, 238 B.R. 25, 56-61 (Bankr. S.D.N.Y. 1999), *affd*, 275 B.R. 699 (S.D.N.Y. 2002) (barring objections not raised before the foreign insolvency court and stating, "[a]s long as the manner in which the scheme acquired statutory effect comports

with our notions of procedural fairness, comity should be extended to it.") (citations omitted); *In re Gee*, 53 B.R. 891, 902, 904 (Bankr. S.D.N.Y. 1985) (stating that "[f]or comity to be extended, it is necessary only that the foreign court abide by fundamental standards of procedural fairness" and noting that the ancillary court, if satisfied with the procedural fairness of the foreign proceeding, "should not sit as an appellate court over the foreign proceedings").[14]

82.     Recent decisions in this District have followed these well-established principles in connection with a foreign representative's request for additional assistance under section 1507 to enforce third party releases similar to the Scheme Releases. *See In re New World Res. N.V.*, Case No. 14-12226 (SMB) (Bankr. S.D.N.Y. Sept. 9, 2014); *In re hibu Inc.*, Case No. 14-70323 (Bankr. E.D.N.Y. Feb. 27, 2014); *In re Magyar Telecom B.V.*, Case No. 13-13508 (SHL) (Bankr. S.D.N.Y. Dec. 11, 2013).

83.     In two notable published decisions from this District, the United States Bankruptcy Court for the Southern District of New York (the "**SDNY Bankruptcy Court**") granted additional assistance to the foreign representative recognizing third party releases approved by a Canadian court.  In *In re Metcalfe*, Judge Glenn of the SDNY Bankruptcy Court considered whether to give full force and effect to certain global releases in favor of each participant in the Canadian asset backed commercial paper market, including numerous non-debtors.  *See In re Metcalfe*, 421 B.R. at 696.  The releases were bolstered by an injunction against proceedings against released non-debtor parties, but certain regulatory proceedings and

---

[14]   Particularly in the bankruptcy context, "American courts have long recognized the particular need to extend comity to foreign bankruptcy proceedings," *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713-14 (2d Cir. 1987), because "[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail." *In re Atlas Shipping A/S*, 404 B.R. at 737. Other courts have similarly underscored the importance of extending comity to foreign bankruptcy proceedings. *See Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d. Cir. 1999); *Maxwell Commc'ns Corp. v. Societe Generale (In re Maxwell Commc'ns Corp.)*, 93 F.3d 1036, 1048 (2d Cir. 1996).

particularized claims based on fraudulent misrepresentation were carved out from the scope of the comprehensive release and injunction. *See id.* at 693. The propriety of those releases and injunctions was contested before the Canadian court, which ultimately held that the third party releases and injunctions were properly granted because they were reasonably connected to the proposed restructuring. *See id.* at 700.

84.     In deciding whether to uphold and enforce in the U.S. chapter 15 case the releases approved by the Canadian court, the SDNY Bankruptcy Court considered a number of factors that weighed in favor of granting comity. In particular, the SDNY Bankruptcy Court noted that "[t]he U.S. and Canada share the same common law traditions and fundamental principles of law" and "Canadian courts afford creditors a full and fair opportunity to be heard in a manner consistent with U.S. due process." *Id.* at 698. In addition, the SDNY Bankruptcy Court took comfort in the fact that the third party non-debtor release and injunction provisions were contested and fully litigated in the Canadian courts, with the Canadian court concluding that it had jurisdiction to enter the requested relief. Moreover, the Canadian plan was adopted with a very high level of creditor support. *Id.* at 700. For these reasons, the SDNY Bankruptcy Court concluded that it was not in a position to second guess the Canadian court, regardless of whether the third party non-debtor release and injunction provisions would have been granted if sought in a U.S. plenary chapter 11 case under the Bankruptcy Code. *See id.* at 696.

85.     Likewise, in *Sino-Forest*, Judge Glenn again addressed the issue of upholding and enforcing non-debtor release and injunction provisions granted in favor of the external auditor of a Canadian debtor in connection with that auditor's entry into a settlement with the debtor's estate. *See In re Sino-Forest Corp.*, 501 B.R. 655 (Bankr. S.D.N.Y. 2013). In *Sino-Forest*, the SDNY Bankruptcy Court again took comfort that the parties to the Canadian proceeding had a

full and fair opportunity to litigate the issues, the trial court reached a reasoned decision that it had the jurisdiction to grant the requested relief and that such relief was appropriate under the circumstances. *See id.* at 666.

86.     In this case, the facts and circumstances surrounding the English Proceeding, the Schemes and the Scheme Releases are very similar to those described in the SDNY Bankruptcy Court's decisions in *Metcalfe* and *Sino-Forest*. *See* Egan Declaration ¶¶ 66-80; *In re Metcalfe*, 421 B.R. 685; *In re Sino-Forest*, 501 B.R. 655. The U.S. and the U.K. share the same common law traditions and fundamental principles of law, and the English Court affords creditors a full and fair opportunity to be heard in a manner consistent with U.S. expectations of due process. *See* Bell Declaration ¶ 18; *In re Bd. of Dirs. of Hopewell*, 238 B.R. at 66 (holding that when a foreign proceeding is in a sister common law jurisdiction, comity should be extended with "less hesitation," there being fewer concerns over the procedural safeguards employed in those foreign proceedings).

87.     Each Scheme contains provisions affording due regard to the "rights and obligations" of all creditors impacted by such Scheme. Specifically, all creditors whose rights and interests will be impacted by the Schemes have the right to vote on such Scheme at creditors' meetings in respect of such Scheme convened by order of the English Court. *See* Bell Declaration ¶¶ 11, 15. Each Scheme must be approved by the requisite percentages of the number of creditors and total value. *See* Bell Declaration ¶ 15. In addition, Scheme Creditors are entitled to appear and instruct counsel to make submissions at the Convening Hearings and Scheme Sanction Hearing. *See* Bell Declaration ¶ 18. The English Court retains independent and final authority to review and approve the Scheme before implementation. *See id.*; *see also In re Sino-Forest*, 501 B.R at 655 (when an issue "ha[s] been fully and fairly litigated" in the courts of

the respective jurisdictions, enforcing the foreign court's order is consistent with principles of comity under section 1507).

88.     Moreover, given that as of the date hereof, approximately 86.2% of the Existing Senior Secured Creditors and approximately 86.9% of the Existing Senior Unsecured Creditors have signed the Lock-Up Agreement pledging their support for the Composite Restructuring, all indications point to very high levels of acceptance of the Schemes among the Scheme Creditors.[15] *See* Egan Declaration ¶ 91.

89.     Finally, the Foreign Representative submits that the additional assistance being sought here will not run afoul of any of the principles enunciated in section 1507(b) of the Bankruptcy Code. Here, section 1507(b)(1) is satisfied because the Companies Act provides a comprehensive procedure for the orderly resolution of claims and the equitable distribution of assets among all the estate's creditors, *see* Bell Declaration ¶¶ 8, 9; section 1507(b)(2) is satisfied because the Scheme Creditors have been given notice of timing and procedures for filing claims and such procedures do not create any additional burdens for a foreign creditor to file a claim, *see* Bell Declaration ¶ 10; section 1507(b)(3) is inapplicable because there are no preferential or fraudulent dispositions of property; and section 1507(b)(4) is satisfied because the Schemes contemplate the distribution of the consideration to be received by each class of Scheme Creditors to be shared ratably among the members of each such class, *see* Egan Declaration ¶¶ 59, 67, similar to the treatment that such separate classes would receive under chapter 11. *See*

---

[15]   The facts of this case are distinguishable from the Fifth Circuit's decision in *In re Vitro S.A.B. de CV*. 701 F.3d 1031 (5th Cir. 2012). Indeed, *Sino-Forest* was decided by a bankruptcy court in this District after consideration of *Vitro* and found *Sino-Forest* to be distinguishable. In *Vitro*, the Fifth Circuit affirmed the bankruptcy court's decision refusing to extend comity to a Mexican court order approving a Concurso plan that provided, in part, for the non-consensual release and discharge of non-debtor subsidiary obligations, including the discharge of certain guarantees. Crucial to both courts' decisions in *Vitro* refusing to enforce the non-consensual releases was opposed by an overwhelming majority of non-insider creditors. Moreover, unlike the Canadian and English court systems, the Mexican court system does not share the same history of common law and due process as the U.S. court system. Finally, unlike the Second Circuit, which permits non-debtor releases to be granted in rare circumstances, the Fifth Circuit has adopted a *per se* rule prohibiting non-debtor releases.

Magyar Transcript at 25:5-26:20; *see also In re Sino-Forest*, 501 B.R. at 664 ("While the factors

identified in section 1507(b)(1)-(5) required to be considered in determining whether to extend

comity in a case under chapter 15, may, in some circumstances, narrow application of the

common law rules for extending comity, none of those factors come into play here.").

90.     For these reasons, the Discretionary Relief sought by the Foreign Representative

including in connection with the recognition of the Scheme Releases is warranted.

**B.     Enforcement of the Discretionary Relief and Scheme Releases is also Warranted Under Section 1521 of the Bankruptcy Code.**

91.     The Discretionary Relief may also be granted under section 1521(a) of the

Bankruptcy Code, which authorizes the court to grant "any appropriate relief" at the request of

the foreign representative, where "necessary to effectuate the purposes of [chapter 15] and to

protect the assets of the debtor or the interests of the creditors." 11 U.S.C. § 1521(a). Here, the

Discretionary Relief including the enforcement of the Scheme Releases is appropriate because

certain Scheme Creditors or other entities may seek to obtain judgments in the United States

against the Debtor, the Parent, the Subsidiary Guarantors or others involved in the Composite

Restructuring (or the Senior Secured Restructuring) in order to obtain more than the *pro rata*

treatment to which they are entitled under the terms of the Schemes. If such Scheme Creditors

can effectively evade the terms of the Schemes by commencing actions in the United States,

those involved in the Debtor's restructuring would be required to defend any such proceedings,

at considerable expense and risk to the restructured Group.

92.     Further, the Scheme Releases are an integral part of the Debtor's restructuring

efforts and are narrowly tailored and limited to conduct surrounding the negotiation and

implementation of the Schemes. *See* Bell Declaration ¶ 23. The only parties giving the Scheme

Releases are the Scheme Creditors, which for their relevant Scheme to be sanctioned by the

English Court, will require the approval of a majority in number representing not less than 75% in value of the applicable Scheme Creditors voting at the applicable Scheme Meeting. *See* Bell Declaration ¶ 15, 22. Based on the foregoing, the Foreign Representative believes the Scheme Releases are reasonable and appropriate under the circumstances and should be recognized and enforced by this Court.[16]

### C.      The Requirements for a Permanent Injunction Have Also Been Satisfied

93.      The standards, procedures and limitations applicable generally to an injunction also apply to relief sought under section 1521(a). *See* 11 U.S.C. § 1521(e). The relief sought in the Petition is warranted under the standard applicable in the Second Circuit for granting a permanent injunction. That standard is essentially the same as the standard for a preliminary injunction, except rather than demonstrate a likelihood of success on the merits, the movant must actually succeed on the merits. *See NextG Networks of N.Y, Inc. v. City of New York*, No. 03CIV9672 RMB/JCF, 2006 WL 538189, at *8 (S.D.N.Y. Mar. 6, 2006), *aff'd in part, rev'd in part on other grounds*, 513 F.3d 49 (2d Cir. 2008). In addition, the movant must make a showing of the likelihood of irreparable harm, i.e., an injury that cannot be redressed through financial compensation. *See id*. Irreparable harm must be likely and imminent, not remote or speculative. *See id.*; *Civic Ass'n of Deaf of New York City, Inc. v. Giuliani*, 915 F. Supp. 622, 631 (S.D.N.Y. 1996).

---

[16]   The Scheme Releases are similar to exculpation clauses frequently included in chapter 11 plans to the extent that they seek to protect the Debtor, certain ad hoc groups, their advisors, current and former directors and other professionals from claims that any Scheme Creditor may have arising from, or in connection with, the negotiation or implementation of the Schemes.  Courts in the Second Circuit routinely approve exculpation clauses that are included in chapter 11 plans. *See In re DBSD N. Am. Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009), *aff'd*, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part*, 627 F.3d 496 (2d Cir. 2010) ("Exculpation provisions are frequently included in chapter 11 plans, because stakeholders all too often blame others for failure to get the recoveries they desire; seek vengeance against other parties; or simply wish to second-guess the decision makers in the chapter 11 case.").

94.     The Supreme Court, the Court of Appeals for the Second Circuit, and courts in
this District have recognized a federal court's authority to grant permanent injunctive relief to
enforce foreign plans and discharges. *See, e.g.*, *Can. S. Ry. Co. v. Gebhard*, 109 U.S. 527, 539
(1883) (concluding that actions brought in the United States by plaintiff bondholders who did not
participate in the Canadian insolvency proceedings of the bond issuer could not be maintained,
even though the bonds were payable in New York); *Argo Fund Ltd. v. Bd. of Dirs. of Telecom
Arg., S.A., ex rel. Foreign Rep. of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom Arg., S.A.)*,
528 F.3d 162, 174-75 (2d Cir. 2008) (concluding that bankruptcy court did not abuse its
discretion in granting full force and effect to Argentine plan and approval order in the United
States); *In re Sino-Forest*, 501 B.R. at 666 (recognizing, enforcing and granting permanent
injunctive relief in chapter 15 case in respect of foreign plan that included protection for third
party releases in Canadian plan); *In re Metcalfe*, 421 B.R. at 700 (same).

95.     It has been consistently held that irreparable harm to an estate exists where the
orderly determination of claims and the fair distribution of assets are disrupted. *See*, *e.g.*, *Victrix
S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713-14 (2d Cir. 1987); *Cunard S.S. Co.
Ltd. v. Salen Reefer Servs. AB.*, 773 F.2d 452, 458 (2d Cir. 1985) ("Unless all parties in interest,
wherever they reside, can be bound by the arrangement which it is sought to have legalized, the
scheme may fail." (citing *Can. S. Ry Co. v. Gebhard*, 109 U.S. 527, 539 (1883))); *In re MMG,
LLC*, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000) ("As a rule. . . irreparable harm exists whenever
local creditors of the foreign debtor seek to collect their claims or obtain preferred positions to
the detriment of other creditors.").

96.     The risk of such irreparable harm is manifest here. Many of the Scheme Creditors
have connections to, or are based in the United States, *See* Egan Declaration ¶ 8, any of them

could bring actions in the U.S. to disrupt the orderly determination of claims and fair distribution of assets under the Schemes. Absent a permanent injunction, the Foreign Representative may be forced to expend significant resources of the Debtor in defense of claims in the United States.

97.    The interests of the affected Scheme Creditors are sufficiently protected under section 1522(a) by the treatment afforded them by the Schemes, the restructuring documents and the process by which they will be approved by the English Court because all Scheme Creditors will be treated similarly. *See* Bell Declaration ¶¶ 10-24. U.S. claimants are not subject to undue convenience or prejudice, and the distribution of consideration under the Schemes is substantially similar to what might occur under a chapter 11 plan. *See Atlas Shipping*, 404 B.R. at 740.

## VIII.    Recognition of the English Proceeding, Granting the Discretionary Relief and Enforcing the Scheme Releases Is Not "Manifestly Contrary" to U.S. Public Policy.

98.    A court may deny a request for any chapter 15 relief that would be "manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.  Courts that have addressed the "public policy exception" in section 1506 of the Bankruptcy Code have noted that the exception is narrow, its application restricted to the most fundamental policies of the U.S., and a foreign judgment should generally be accorded comity if the foreign jurisdiction's proceedings meet fundamental standards of fairness.  *See Collins v. Oilsands Quest Inc.*, 484 B.R. 593, 597 (Bankr. S.D.N.Y. 2012);  *See also In re Metcalfe*, 421 B.R. at 697 (holding that a U.S. bankruptcy court is not required to make an independent determination about the propriety of the acts of a foreign court, but only whether their procedures meet U.S. standards of fundamental fairness).  Further, the relief granted in a foreign proceeding and the relief available in a U.S. proceeding need not be identical.  Courts have even gone so far as to hold that even the absence of a jury trial right    a right embodied in the U.S. Constitution    in a foreign proceeding

42

would not justify the court's refusal to recognize the foreign proceeding pursuant to the public policy exception. *See Muscletech Research & Dev. Inc. v. Aguilar (In re Ephedra Prods. Liab. Litig.)*, 349 B.R. 333, 335-36 (Bankr. S.D.N.Y. 2006).

99.    Here, recognition of the English Proceeding and any orders issued by the English Court during the pendency of the English Proceeding, and granting of the Discretionary Relief including enforcement of the Scheme Releases, would not be "manifestly contrary to the public policy of the United States" so as to justify refusal to recognize the English Proceeding and enforce the English Court's order. First, the Discretionary Relief requested is similar to the relief available under chapter 11 with respect to pre-packaged plans of reorganization. In the Second Circuit, third party releases are granted in certain circumstances and more liberally than in other Circuits. Since enactment of chapter 15 of the Bankruptcy Code, courts in the Second Circuit have recognized and given effect to similar Canadian schemes that included non-consensual third party releases. *See In re Metcalfe*, 421 B.R. 685; *In re Sino-Forest*, 501 B.R. 655.[17] It is also notable that a central tenet of the Debtor's restructuring is that the Senior Secured Scheme can only compromise Existing Senior Secured Debt and the Parallel SUN Scheme can only compromise Existing Senior Unsecured Notes. As previously noted, any extinguishment of guarantee claims held by the Existing Senior Unsecured Noteholders as a result of the sanctioning of the Senior Secured Scheme will occur as a matter of contract under the Existing Intercreditor Agreement, and this motion does not request any relief related thereto. *See* Egan Declaration ¶ 28.

100.    In analyzing whether granting the requested relief would be manifestly contrary to the public policy of the United States, the court in *Metcalfe* noted that relief requested in support

---

[17]    See ¶ 81 for chapter 15 cases in which New York bankruptcy courts have recognized schemes that included non-consensual third party releases.

of a foreign proceeding need not be identical to relief available in a plenary case in the United

States and that the "public policy" exception is to be narrowly construed to include only the most

fundamental policies of the United States within its scope. *In re Metcalfe*, 421 B.R. at 697. The

court understood that the "key determination" it was required to make was "whether the

procedures used in Canada [met U.S.] fundamental standards of fairness." *Id.* (citing *Cunard S.S.

Co.*, 773 F.2d at 457); *see also* Magyar Transcript at 23:7-24:7 (citing *In re Metcalfe*, 421 B.R.

685).

101.     The Metcalfe court therefore examined the Canadian scheme using the traditional

standards American courts employ to analyze whether ordinary foreign judgments should be

recognized and enforced, i.e., whether the forum provides "a full and fair trial abroad before a

court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation

or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an

impartial administration of justice between the citizens of its own country and those of other

countries, and there is nothing to show either prejudice in the court, or in the system of laws

under which it is sitting." *In re Metcalfe*, 421 B.R. at 698 (internal citations omitted).

102.     In this case, the English Proceeding clearly meets these standards: (a) the English

Court's exercise of jurisdiction over the Debtor and the Schemes was proper pursuant to part 26

of the Companies Act, *see* Bell Declaration ¶ 1; (b) the steps undertaken and to be undertaken

pursuant to the Schemes can become effective, and how they become effective, sufficiently

conform to American notions of due process such that this Court should grant comity to the

Schemes, *see* Bell Declaration ¶¶ 10-24; (c) specific steps in the English Proceeding also

demonstrate a commitment to adequate process, which includes adequate service of process, *see*

Bell Declaration ¶ 10; and (d) United States and other non-English creditors have the same rights

to participate in the English Proceeding a English creditors, *see* Bell Declaration ¶ 12, note 3. *See also* Magyar Transcript at 23:7-25:23 (finding a U.K. scheme of arrangement readily satisfies the standards American courts used to analyze whether ordinary foreign judgments should be recognized and enforced).

103.    As such, recognition of the Schemes, granting of the Discretionary Relief and enforcement of the Scheme Releases contained therein is not manifestly contrary to U.S. public policy.

## CONCLUSION

104.    The Foreign Representative respectfully submits that (a) the English Proceeding should be recognized as a "foreign main proceeding" under section 1517 of the Bankruptcy Code, (b) the Foreign Representative is a person who meets the definitional requirements of section 101(24) of the Bankruptcy Code, (c) the petition meets the requirements of section 1515 of the Bankruptcy Code, and (d) granting additional relief in respect of the Discretionary Relief including the Scheme Releases and any injunctions contemplated thereby is permitted under sections 1507 and 1521 of the Bankruptcy Code.

## SATISFACTION OF LOCAL RULE BANKRUPTCY RULE 9013-1(A)

105.    The Petition includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to the Petition.  Accordingly, the Foreign Representative submits that the Petition satisfies Rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York.

## NOTICE

106.    Notice of this Petition has been provided to the following parties, or their counsel, if known: (i) the United States Trustee for the Southern District of New York; (ii) the Existing SSN Trustee; (iii) the Existing FRN Trustee; (iv) the Existing SUN Trustee; (v) the RCF Agent;

(vi) counsel to the Secured Ad Hoc Committee; (vii) counsel to the Unsecured Ad Hoc Committee; (viii) the Debtor; (ix) counsel to the Debtor, (x) the Information Agent and (xi) all parties required to be given notice under Bankruptcy Rule 2002(q)(1) of which the Foreign Representative is aware.  The Foreign Representative submits that no other or further notice need be provided.

## NO PRIOR REQUEST

107.    No prior request for the relief sought in this Petition has been made to this or any other court.

WHEREFORE, the Foreign Representative respectfully requests entry of an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as is just and proper.

Dated:      New York, New York
            March 6, 2015

Respectfully submitted,


/s/ Robert H. Trust
Paul Hessler
Aaron Javian
Robert H. Trust
LINKLATERS LLP
1345 Avenue of the Americas
New York, NY 10105
(212) 903 9000 (Tel)
(212) 903 9100 (Fax)

Counsel to the Foreign Representative

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------

*In re*

Towergate Finance plc,

      Debtor in a Foreign Proceeding.

------------------------------------------------

Chapter 15

Case No. 15-_____  (__)

**STATEMENT OF VERIFICATION**

Pursuant to 28 U.S.C. § 1746, Scott Egan hereby declares as follows under penalty of perjury:

      1.    I am the duly authorized foreign representative of Towergate Finance plc and am duly authorized to commence and act in this chapter 15 case and make this Petition.

      2.    I have read the foregoing Petition and believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information and belief.

      3.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:     London, England
            March 6, 2015

                                                            _____
                                                     Scott Egan
                                                     Interim Chief Executive Officer