Paul Hessler
Aaron Javian
Robert H. Trust
LINKLATERS LLP
1345 Avenue of the Americas
New York, NY 10105
(212) 903 9000 (Tel)
(212) 903 9100 (Fax)

Counsel to Scott Egan
as Petitioner and Foreign Representative

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re* | Chapter 15 |
| Towergate Finance plc, | Case No. 15-_____(____) |
| Debtor in a Foreign Proceeding. | |

### DECLARATION OF SCOTT EGAN IN SUPPORT OF VERIFIED PETITION UNDER CHAPTER 15 FOR RECOGNITION OF A FOREIGN MAIN PROCEEDING AND OTHER RELIEF

Pursuant to 28 U.S.C. § 1746, I, Scott Egan, hereby submit this declaration (the "**Declaration**") under penalty of perjury:

1.      I am the Interim Chief Executive Officer of Towergate Finance plc (the "**Debtor**" and, collectively with its subsidiaries and holding companies, "**Towergate**" or the "**Group**"), a public limited company incorporated under the laws of England and Wales.  In such capacity, I am familiar with the Group's businesses, day-to-day operations, and financial affairs.  This Declaration has been drafted to support the Debtor's Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding and Other Relief (the "**Petition**").

2.      The Debtor's requests to approve certain schemes of arrangement (the "**English Proceeding**") are currently pending before the High Court of Justice of England and Wales (Chancery Division) (Companies Court) (the "**English Court**").  I have been appointed by the English Court to be the Debtor's foreign representative (the "**Foreign Representative**") for purposes of this chapter 15 case, and I am authorized to commence this chapter 15 case.

3.      On 17 February 2015, the Debtor filed applications under Part 26 of the Companies Act 2006 (England) requesting that the English Court order two meetings of the Debtor's creditors, thereby commencing the English Proceeding for the purpose of obtaining the requisite consents in connection with the restructuring of the Debtor's outstanding debt obligations.   On 6 March, 2015, the English Court entered the convening orders (the "**Convening Orders**"), attached as **Exhibit C** to the Petition, which named me as the "foreign representative" as defined in section 101(24) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**") and provided me with authorization to file the Petition for recognition of the English Proceeding.[1]

4.      On the date hereof (the "**Petition Date**"), I filed the Petition pursuant to sections 1504 and 1515 of the Bankruptcy Code commencing this chapter 15 case, seeking recognition of the English Proceeding as a "foreign main proceeding," as such term is defined in section 1502(4) of the Bankruptcy Code, and seeking other necessary relief in support of the English Proceeding.

5.      The Declaration begins with the background of the Debtor and other relevant corporate entities in the Group. Further, the Declaration discusses the Debtor's current capital structure, relevant financing arrangements, the current financial position of the Debtor and the

---

[1]      On March 5, 2015,  the Debtor's board of directors also met and by resolution appointed me as the "foreign representative" as that term is defined in section 101(24) of the Bankruptcy Code.

Group and the negotiations with the Debtor's creditors and stakeholders that have taken place in 2014 and 2015. The Declaration will also provide an overview of a restructuring framework that, if approved by one or both classes of creditors in accordance with the requisite consent thresholds and the English Court, will be implemented through two separate but connected U.K. schemes of arrangement of the Debtor (the "**Schemes**"). Finally, the Declaration ends with statements in my capacity as the Debtor's foreign representative to satisfy the requirements of section 1515 of the Bankruptcy Code and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

**I.    BACKGROUND**

**A.    The Debtor and Its Corporate Group Structure**

6.    Incorporated on 8 April 2010, the Debtor is a public limited company incorporated under the laws of England and Wales. The Debtor's registered office is at Towergate House, Eclipse Park, Sittingbourne Road, Maidstone, Kent, England ME14 3EN. The Debtor does not engage in any operating activities, but functions rather as a financing vehicle for the Group by issuing secured and unsecured debt and on-lending the corresponding proceeds to the Group's operating subsidiaries.    The Debtor's direct parent is Towergate Holdings II Limited ("**Parent**"), a private company incorporated under the laws of England and Wales.    The Debtor and the Parent are ultimately owned by Towergate Partnershipco Limited, a private company incorporated under the laws of England and Wales which is owned by certain individual shareholders and funds managed by Advent International Corporation ("**Advent**"). Towergate Partnershipco Limited is headquartered in England and it runs the Group's operations from its headquarters.    The Group does not operate outside of the U.K. or have any substantive connection to any other jurisdiction.

7.      The Debtor's principal assets are (a) its 100% equity interest in Towergate Insurance Limited, which in turn directly and indirectly owns the Group's operating subsidiaries (the "**Operating Subsidiaries**") and (b) the receivables owed by the Operating Subsidiaries under certain intercompany loans made by the Debtor to the Operating Subsidiaries.

### B.      The Debtor's Connections to the United States

8.      Though the Debtor has no place of business in the United States, (i) the Existing FRN Indenture under which it issued the Existing FRNs, (ii) the Existing SSN Indenture under which it issued the Existing SSNs and (iii) the Existing Senior Unsecured Notes Indenture under which it issued the Existing Senior Unsecured Notes (each as defined below) are, by each of their terms, governed by New York law. In each of the indentures referenced above, the Debtor has expressly consented to the jurisdiction of any federal or state court located in the Borough of Manhattan in New York, New York and appointed Corporation Services Company, as its agent for service of process in actions arising thereunder or any of the transactions contemplated thereby. Moreover, some of the Existing Senior Secured Noteholders and the Existing Unsecured Noteholders likely have connections to, or are based in, the United States.

9.      The Debtor owns funds in an undrawn retainer with Linklaters LLP, the Debtor's U.S. counsel in connection with the filing of this chapter 15 case, which is being held in an interest-bearing client trust account with JPMorgan Chase Bank, N.A. in the Borough of Manhattan in the City of New York, New York (the "**Client Trust Account**"). Pursuant to the terms of an engagement letter between the Debtor and Linklaters LLP dated 12 February 2015, the Debtor deposited US$49,965 in the Client Trust Account on 17 February 2015 and such funds remain in the Client Trust Account as of the date hereof.  Linklaters LLP is only permitted to apply the funds in the Client Trust Account to outstanding invoiced amounts with the Debtor's prior written consent. The Debtor is the beneficiary of all interest that accrues on the funds in the

4

Client Trust Account.  Other than the Client Trust Account, the Debtor does not have any property located in the U.S.

### C.    The Business and History of the Debtor and the Group

10.    Towergate is the leading independently-owned insurance intermediary company distributing general insurance products in the United Kingdom based on gross written premium. It has more than 90 offices across the U.K. Since the Group was formed in 1997, it has grown principally by acquisitions having purchased over 295 businesses since inception.  In 2013, the Group's operations handled approximately £3.1 billion of *pro forma* gross written premium, which was in line with 2012. The Group distributes insurance products through the Group's own brokers and third-party brokers, including mortgage brokers and other mortgage intermediaries. The Group also provides services to members of its broker network. The Group focuses on small- and medium-sized enterprises ("**SMEs**") in the commercial insurance market and on specialist personal insurance markets. Due to the breadth of its operations, the Group performs many of the roles in the insurance supply chain other than the provision of capital in respect of insurance claims. The Group does not incur any underwriting risk at any stage of the process and therefore has limited regulatory capital requirements. In 2013, the Group employed 5,400 employees, all of whom were located in the United Kingdom.

11.    At present, funds managed by Advent own directly or indirectly 68.42 per cent. of the voting share capital of Towergate Partnershipco Limited. The remainder of the voting share capital of Towergate Partnershipco Limited is mainly held by a combination of existing and former management.

D.      **Overview of Towergate's Business**

12.      Towergate's principal businesses are split into the following divisions: the Insurance Brokers division, the Direct division, the Underwriting division, the Paymentshield division and the Networks division.

### 1.      The Insurance Broker Division

13.      The Insurance Brokers division distributes specialised personal lines products and more general products aimed at SMEs through around 90 broking offices located across the United Kingdom. The brokers place the insurance policies of our customers through our own underwriting agencies or directly with insurance companies depending on which insurance product is best suited to the needs of the customer. As part of the Insurance Brokers division, the Group also offers regulated and unregulated financial advisory services to corporate and private clients across the United Kingdom under the brand name Towergate Financial (although the Group is considering disposing of the Towergate Financial Business, to be completed by the end of February 2015).

### 2.      The Direct Division

14.      The Direct division businesses provide insurance coverage to specialist customer segments ranging from military personnel and high net worth individuals to caravan owners and SMEs. The division offers services to many niche markets and volume SME businesses, including the Federation of Small Businesses.

### 3.      The Underwriting Division

15.      The Underwriting division provides insurance products to around 3,000 insurance brokers who act on behalf of insured customers. As an underwriting agency, the Group prices insurance coverage, issues insurance policies and, in most cases, handles insurance claims on behalf of insurance companies. Insurance companies are ultimately responsible for insurance

6

claim costs and thus carry the associated capital risk. The Group offers over 400 insurance products covering a wide variety of risks. As in the Insurance Brokers and Direct divisions, these insurance products consist primarily of specialised products aimed typically at non-standard personal lines customers and more general products aimed at SMEs. The Group operates via 3 underwriting businesses.

### 4.    The Paymentshield Division

16.    Paymentshield provides household-related insurance products, such as household-related insurance and mortgage payment protection insurance, via third-party mortgage brokers and other mortgage intermediaries, such as estate agents, independent financial advisers and loan brokers. Paymentshield is the leading distributor for household-related insurance products to the mortgage intermediary market in the United Kingdom. Following the sale of its products, Paymentshield assumes the relationship directly with the end customer. Paymentshield is also growing its volume of new business generated through sources other than mortgage intermediaries, including selling through third-party call centres and responding to inbound inquiries. As with the broking business, all underwriting risk is carried by the Group's insurance partners.

### 5.    The Networks Division

17.    The Networks division provides independent brokers with access to insurance products and a variety of business support services. The insurance products available through the Networks division are often only available to members and include all the products available from the Group's own underwriting agencies. Members typically also receive enhanced commission rates negotiated by the Networks division. The business support services provided to members assist them in managing their business and range from marketing to compliance

services and advice. The Networks division is the largest full service general insurance network for brokers in the United Kingdom by number of members.

### E.    The Role of the Financial Conduct Authority

18.    The Group's insurance intermediary and certain of its financial services activities are regulated by the UK Financial Conduct Authority (the "**FCA**") both as to business conduct and as to prudential matters. The FCA's statutory objectives are to maintain market integrity and consumer protection, and, to this end, it has prescribed rules, principles and guidance (the "**FCA Rules**") in accordance with which regulated operations must comply. The FCA Rules impose, among other things, high level standards on the establishment and maintenance of proper systems and controls, minimum "threshold conditions" that must be satisfied for an insurance firm to remain authorised, certain minimum capital and liquidity requirements and rules on the conduct of business and treating customers fairly. The Group has an ongoing obligation to provide the FCA with certain information regularly. Monitoring is carried out by the FCA to assess the Group's compliance with regulatory requirements by way of surveys, thematic reviews and formal risk assessments. The FCA has broad investigative and disciplinary powers, including the power to impose fines, vary or cancel regulatory permissions and, in extreme cases, requires an orderly wind-down of the operations of a regulated business to minimise any threat to its statutory objectives. Previous FCA reviews have identified a number of concerns related to the Restructured Group's business including those detailed in paragraph 34 below. The recent liquidity issues of the Group have been of particular concern to the FCA and during the period in which the Group has been engaged in dialogue with its creditors, it has simultaneously been engaged in a regulatory dialogue with the FCA. Any failure to comply with the FCA Rules could lead the FCA to take any action within its powers as detailed above.

## II.    THE DEBTOR'S CAPITAL STRUCTURE

19.    As of 30 January 2015, the Debtor had outstanding indebtedness of approximately £1,050,131,849.    The Debtor's secured indebtedness consists of two New York law governed senior secured note issuances (the Existing SSNs and the Existing FRNs), as well as a secured revolving facility agreement (the RCF).    The Debtor is also issuer in respect of certain New York law governed senior unsecured notes due 2019 (the Existing Senior Unsecured Notes).    Below is a summary of the Debtor's principal debts which I will describe in greater detail herein.

EXISTING SENIOR SECURED CREDITORS

|  | Total Principal Outstanding (as at 30 January 2015) (£) | Total Accrued Interest (as at 30 January 2015) (£) |
|---|---|---|
| RCF | 85,000,000 | 808,412.56 |
| Existing FRNs | 396,000,000 | 5,976,427.44 |
| Existing SSNs | 233,980,000 | 9,115,470.83 |
| **Total** | **714,980,000** | **15,900,310.83** |

EXISTING SENIOR UNSECURE NOTEHOLDERS

|  | Total Principal Outstanding (as at 30 January 2015) (£) | Total Accrued Interest (as at 30 January 2015) (£) |
|---|---|---|
| Existing Senior Unsecured Notes | 304,593,000 | 14,658,538.13 |

### A.    The Existing Senior Secured Notes

20.    The Debtor is the issuer of £233,980,000 8.5% senior secured notes due 2018 (the "**Existing SSNs**") pursuant to a New York law governed indenture dated 11 February 2011 between, amongst others, the Parent, as guarantor, the Debtor, as issuer, Lloyds Bank plc, as security agent, and The Bank of New York Mellon, London Branch, as trustee (as amended, supplemented and/or restated from time to time, the "**Existing SSN Indenture**"). As of 30

January 2015, the total principal outstanding was £233,980,000 under the Existing SSNs. The holders of the Existing SSNs are referred to herein as the "**Existing SSN Noteholders**". The Existing SSNs are guaranteed irrevocably and unconditionally on a joint and several basis by the Parent and certain of the Debtor's subsidiaries (the "**Subsidiary Guarantors**").

### B.        The Existing Floating Rate Notes

21.        The Debtor is the issuer of £396,000,000 floating rate senior secured notes due 2018 (the "**Existing FRNs**") pursuant to an indenture dated 10 May 2013 between, amongst others, the Parent, as guarantor, the Debtor, as issuer, Lloyds Bank plc, as security agent, and The Bank of New York Mellon, London Branch, as trustee (as amended, supplemented and/or restated from time to time, the "**Existing FRN Indenture**"). As of 30 January 2015, the total principal outstanding was £396,000,000. The holders of the Existing FRNs are referred to herein as the "**Existing FRN Noteholders**", and together with the Existing SSN Noteholders, the "**Existing Senior Secured Noteholders**". The Existing FRNs are guaranteed irrevocably and unconditionally on a joint and several basis by the Parent and the Subsidiary Guarantors.

### C.        The Existing Revolving Credit Facility Agreement

22.        The Debtor is a borrower under a certain £85,000,000 revolving credit facility agreement dated 9 May 2013 with, amongst others, the Parent as guarantor, Lloyds Bank plc as security agent and as agent (in such capacity, the "**RCF Agent**") and the lenders in connection therewith from time to time (the "**RCF Lenders**") (as amended, supplemented and/or restated from time to time, the "**RCF**" and, together with the Existing SSNs and the Existing FRNs, the "**Existing Senior Secured Debt**"). Loans under the RCF mature on 15 November 2017 and bear interest at rates per annum equal to LIBOR, or in relation to any loan in Euro, EURIBOR plus 4.50%. As of 30 January 2015, the total principal outstanding was £85,000,000 under the RCF. The existing RCF Lenders as at the date of the Schemes, together with the Existing SSN

Noteholders and the Existing FRN Noteholders are referred to herein, collectively, as the "**Existing Senior Secured Creditors**".  Loans under the RCF are guaranteed irrevocably and unconditionally on a joint and several basis by the Parent and the Subsidiary Guarantors.

23.     The Existing RCF, the Existing FRNs and the Existing SSNs are secured by a common security package: (i) an English law governed debenture dated 11 February 2011 and entered into between, *inter alia*, the Debtor and the Existing Security Agent (as defined in paragraph 59 below); (ii) an English law governed debenture dated 27 June 2012 and entered into between, *inter alia*, the Debtor and the Existing Security Agent; and (iii) an English law governed debenture dated 10 May 2013 and entered into between, *inter alia*, the Debtor and the Existing Security Agent.  The security consists of pledges of all (or the majority of) the share capital of the Parent, the Debtor and the Subsidiary Guarantors and substantially all the other tangible and intangible assets of the Parent, the Debtor and the Subsidiary Guarantors. The liens securing each of the Existing SSNs, the Existing FRNs and the Existing RCF rank *pari passu* with one another.

## D.     The Existing Senior Unsecured Notes

24.     The Debtor is the issuer of £304,593,000 senior unsecured notes due 2019 (the "**Existing Senior Unsecured Notes**") pursuant to a New York law governed indenture dated 11 February 2011 between, amongst others, the Parent, the Debtor and The Bank of New York Mellon, London Branch, as trustee (as amended, supplemented and/or restated from time to time, the "**Existing Senior Unsecured Notes Indenture**").  As of 30 January 2015, the total principal outstanding was £304,593,000 and the total accrued interest outstanding was £14,658,538 under the Existing Senior Unsecured Notes. The holders of the Existing Senior Unsecured Notes are referred to herein as the "**Existing Senior Unsecured Noteholders**" and, together with the Existing Senior Secured Creditors, the "**Scheme Creditors**").

25.    The Existing Senior Unsecured Notes are guaranteed irrevocably and unconditionally on a joint and several basis by the Parent and the Subsidiary Guarantors.

26.    The guarantees for the Existing SSNs, the Existing FRNs, the Existing RCF and the Existing Senior Unsecured Notes rank *pari passu* with one another.

### E.    The Existing Intercreditor Agreement

27.    The rights of the Existing Senior Secured Creditors under the RCF and the Existing Senior Secured Notes and of the Existing Senior Unsecured Noteholders in relation to the Existing Senior Unsecured Notes, and the ranking of the debts and liabilities owed, are regulated by an Intercreditor Agreement dated 4 February 2011 between, amongst others, the Debtor and the Existing Security Agent (as defined below), as amended and restated from time to time (the "**Existing Intercreditor Agreement**") governed by English law.

28.    Under clause 13.2 of the Existing Intercreditor Agreement, the claims of the Existing Senior Secured Creditors and the claims of the Existing Senior Unsecured Noteholders against the Parent, the Debtor and the Subsidiary Guarantors can be released upon a distressed disposal of the shares of certain Group companies.  Although the Senior Secured Scheme (as defined below) contemplates a distressed disposal in connection with the Senior Secured Restructuring in order to effectuate a release of the guarantee claims held by the Existing Senior Unsecured Noteholders against the Subsidiary Guarantors, the Debtor is neither seeking approval from the English Court of such releases under the Senior Secured Scheme nor recognition of such releases in this chapter 15 case.

## III.    EVENTS GIVING RISE TO THE ENGLISH PROCEEDING

29.    The Debtor's (and the Group's) trading performance since mid-2014, coupled with the significant risk that it may have material liabilities under certain ongoing regulatory investigations into historic business practices, has resulted in the Debtor and the Group facing

12

financial difficulties particularly in light of the Debtor's debt service obligations. As a result, the Debtor has, since November 2014, been in negotiation with its creditors and other stakeholders with a view to restructuring its capital structure and financial obligations. Linklaters LLP and N M Rothschild & Sons Limited have acted respectively as legal adviser and financial adviser to the Debtor throughout such negotiations.

30.    Whilst the Group's proven success in conducting acquisitions has provided it with scale in key markets, its historic acquisition strategy also resulted in a high degree of fragmentation across the business. This fragmentation, coupled with the changing regulatory environment in recent years, caused the Group to identify as key priorities the need to implement a stronger governance and control framework, to reduce costs by realising cross-Group synergies such as insurer relationships and product / data capabilities, and to drive benefits from the Group's scale in areas such as acquisitions, risk management, IT, HR and finance transformation.

31.    Implementation of an extensive "Change Programme" designed to achieve these strategic objectives commenced in 2013. However, as reported in the 2014 quarterly bondholder reports, during the course of 2014 it became apparent that a number of the initiatives making up the Change Programme would be more complex and challenging to execute than had initially been envisaged. As a result, the costs of implementing the Change Programme have increased whilst the anticipated benefits, in particular the forecast cost savings, are taking longer to materialise. The impact of the ongoing organisational change has been felt across the Group's entire business but has been particularly acute in the broking division, and has been compounded by both challenging market conditions and the ongoing uncertainty surrounding the Group's future. In these circumstances, the Group has not made any acquisitions since July 2014. This

means that the Group has had to rely on organic performance and has not been able to look to acquired businesses to support revenues or EBITDA.

32.    Pursuant to disclosures in the Q3 report dated 19 November 2014, there was uncertainty around the operational cash flow and liquidity in the first quarter of 2015, particularly in the context of the February 2015 coupon payments (as detailed in paragraph 37), together with the potential for the Group to breach the financial covenant under its RCF. Trading income in the third quarter of 2014 was impacted by the significant level of organisational change across the business, specifically in the broking business. Trading performance, together with the impact of investment in the Change Programme and costs incurred in relation to regulatory investigations, contributed to a net cash outflow before financing of £59 million for the nine month period ended 30 September 2014 (as compared to £40 million outflow for the nine month period ended 30 September 2013), with the Group holding £42 million of unrestricted cash as at 30 September 2014 (as compared to £12 million as at 30 September 2013) having fully drawn the £85 million RCF (as compared to £43 million as at 30 September 2013).

33.    Following the Group's trading update on 23 December 2014, the Group has prepared preliminary, unaudited numbers for the twelve months ended 2014 at consolidated and divisional levels. These preliminary results indicate that overall consolidated income for the Group in 2014 declined by 4 per cent. as compared to 2013. Financial performance in the fourth quarter of 2014 continued to be impacted by the ongoing Change Programme. Additionally, a number of trading deals were not finalised with insurers before the year-end due to the uncertainties affecting the Group. Excluding the impact of these trading deals, consolidated organic income for 2014 declined by 5 per cent.  compared to the previous year.

34.    Furthermore, the Group continues to be in discussions with the FCA in relation to past advice provided by the Towergate Financial business in the context of the FCA's more general investigations into: (i) the suitability of bulk pension transfer advice provided by financial advisers where employers offered an enhancement to the transfer value ("**ETV**") available to incentivise current and former employees to leave their existing defined benefit pension schemes; and (ii) the promotion of Unregulated Collective Investment Schemes ("**UCIS**") to retail clients, the advice provided by firms as to the suitability of UCIS and the adequacy of firms' systems and controls to support their UCIS activities.

35.    Given the number of material uncertainties that continue to exist, it is not yet possible to make a reliable estimate of the Group's ultimate liability in connection with these investigations. However, on the basis of my diligence, the Group's working estimate (for the purposes of business planning) of potential redress costs for ETV and UCIS in aggregate, including costs and expenses is between £65 million to £85 million (though ultimate liability for ETV and UCIS may be materially different to this range). This estimate does not include any recoveries that may be available from relevant third parties and under the Group's insurance arrangements, both of which the Group continues to pursue, the timing and extent of such recoveries remains unclear.  This is an issue on which the FCA has been focusing, and the Group has estimated in its cashflows that the aggregate redress costs will need to be funded in due course following the Senior Secured Restructuring or the Composite Restructuring.

36.    The combined effect of the foregoing, together with the burden of the Group's debt service obligations, is that the Group found itself facing increasing financial constraints during the second half of 2014 and the beginning of 2015 and the possibility of a material liquidity shortfall by the time of the coupon payments falling due under the Existing Senior

Secured Debt and Existing Senior Unsecured Notes in February 2015. The Group initially sought to address these constraints through disposals of non-core businesses and other identified management actions, and to this end completed the disposal of its 90 per cent. holding in Hayward Aviation Limited to Jardine Lloyd Thompson Group plc on 23 December 2014 for total cash consideration of approximately £23 million.

37.     Despite these steps, the Group did not pay the £6 million coupon payment due on 2 February 2015 in respect of the Existing FRNs. There has therefore been a default under the Existing FRNs Indenture, which following a 30-day grace period will lead to an event of default thereunder. Even after taking into account the operational and cost synergies expected to result from the Change Programme during the second half of 2015 and into 2016, the Group requires a restructuring of its capital and financial structure in order to provide a stable platform upon which it can continue to operate its business.

38.     Given the current conditions affecting the Group and the impact on the Group's trading performance, it is the clear view of the board of directors that the Group's current level of debt is unsustainable. In the absence of a restructuring, the Group's financial position is not sufficiently robust to provide a sound basis for its business going forward, even after taking into account the operational and cost synergies expected to result from the Change Programme.

39.     The Board believes, on the basis of professional advice that it received, that, in the absence of a successful restructuring, part or all of the Group is likely to enter into an insolvency procedure. The Group does not have the ability to repay the indebtedness in respect of the RCF, the Existing Senior Secured Notes and the Existing Senior Unsecured Notes in the event that the Existing Senior Secured Debt is accelerated as a result of the default arising in respect of the unpaid interest coupon of £6 million due in respect of the Existing FRNs on 2 February 2015.

As a result, the appropriate comparator for the purposes of the Schemes is likely insolvency because the Group is unable to pay the sums owing to all its creditors.

40.    If the Group enters into an insolvency procedure other than in connection with the implementation of the Composite Restructuring Proposal or the Senior Secured Restructuring Proposal, the Board believes, on the basis of professional advice that it received, that it is likely that the ultimate proceeds available to the Group's creditors would be reduced to a level which is considerably less than if either the Composite Restructuring Proposal or the Senior Secured Restructuring Proposal was implemented (the latter of which would likely not provide for any recoveries for Existing Senior Unsecured Noteholders). The Board believes that continuing to run the business as a going concern (as would be the case following the implementation of the Composite Restructuring or the Senior Secured Restructuring) offers (i) a greater probability of higher recoveries for the relevant Scheme Creditors and (ii) better prospects for the Group's employees, in each case when compared with prospect of the Group entering into insolvency procedure other than in connection with the implementation of the Composite Restructuring Proposal or the Senior Secured Restructuring Proposal.

41.    Set out in the following paragraphs is an overview of the Group's negotiations with key stakeholders, which ultimately led, firstly to the Secured Ad Hoc Committee putting forward the proposed Senior Secured Restructuring Proposal and secondly, to the Secured Ad Hoc Committee and the Unsecured Ad Hoc Committee agreeing the proposed Composite Restructuring Proposal (described in Sections (V)(A) and (V)(B) below) and the Schemes (described in Sections (V)(C) and (V)(D) below).

IV.    **FINANCIAL RESTRUCTURING EFFORTS PRIOR TO THE ENGLISH PROCEEDING**

A.    **Group Considers M&A Process**

42.    Shortly prior to the Q3 2014 Results Announcement, the Group received approaches from parties indicating a preliminary interest in a potential M&A transaction with the Group (the "**Potential Acquisition**").  These approaches were made public as part of the Q3 2014 Results Announcement, shortly after which inbound contact was received by 12 additional parties also interested in the Potential Acquisition.

43.    At the start of December 2014 and in parallel with discussions with the Secured Ad Hoc Committee and the Unsecured Ad Hoc Committee, the Existing Senior Secured Noteholders and the other stakeholders of the Group as described above, the Group instructed Evercore International Partners International LLP ("**Evercore**"), a reputable internationally recognised investment banking advisory firm, to undertake an outbound M&A process ("**M&A Process**") on the Group's behalf with a view to eliciting interest in the Potential Acquisition from a range of prospective purchasers.  An additional 15 parties, comprising strategic and financial purchasers identified as potentially interested parties by the Group and Evercore based on their knowledge of the market were approached as part of the outbound process.

44.    The Group also issued a public announcement on 4 December 2014 inviting Senior Unsecured Noteholders to contact Evercore in order to express their interest in the Potential Acquisition and to participate in the M&A process.

45.    On 23 December 2014, Moelis & Company UK LLP, as financial adviser to the Secured Ad Hoc Committee, submitted a letter to, amongst others, the Debtor confirming that the members of Secured Ad Hoc Committee supported the M&A Process and formally expressing the interest of members of the Secured Ad Hoc Committee's in participating in the

M&A Process, together with other Existing Senior Secured Creditors, with a view to submitting a proposal to acquire the Group by way of a credit bid for an amount equal to the aggregate amount of indebtedness owing to the Existing Senior Secured Creditors plus £1. The proposed acquisition was intended to implement a financial restructuring comprising a significant deleveraging and a new money facility being available to the Group in order to provide a sustainable capital structure for the long term.

46.    As at 30 January 2015, the Group had received two Indicative Proposals and a proposal put forward by the Secured Ad Hoc Committee (as described in paragraphs 58-59 below). The terms of such Indicative Proposals included a value range that would indicate ultimate recoveries significantly lower than the liabilities currently owed to the Existing Senior Secured Creditors.

47.    In addition to the value ranges contained in Indicative Proposals described above, the Group has received: (i) a formal valuation report on the Group; and (ii) an informal valuation letter (together the "**Valuations**"), in each case from an independent, reputable, internationally recognised investment bank or accounting firm regularly engaged in providing valuations of businesses similar to that of the Group. Each of the Valuations indicated a net value range for the Group lower than the liabilities currently owed to the Existing Senior Secured Creditors.

48.    The Debtor intends to procure a fairness opinion from an independent, reputable internationally recognised investment bank or accounting firm in connection with the Senior Secured Restructuring.

### B.    Negotiations with the Existing Senior Unsecured Holders

49.    An *ad hoc* committee of Existing Senior Unsecured NoteHolders (the "**Unsecured Ad Hoc Committee**") was formed in November 2014. The Unsecured Ad Hoc Committee appointed Houlihan Lokey (Europe) Limited as their financial advisers and Ropes &

Gray International LLP as their legal advisers. The Unsecured Ad Hoc Committee currently represents approximately 63 per cent. of the Existing Senior Unsecured Noteholders.

50.     The Unsecured Ad Hoc Committee and its advisers were subsequently given access to detailed financial and legal information about the Group and have had extensive discussions and correspondence with the Group's management and its advisers.

51.     On 22 December 2014, the Group received a proposal ("**SUN Proposal 1**") from certain Senior Unsecured Noteholders wishing to participate in a financial restructuring of the Group. The terms of SUN Proposal 1 included, among other things, £230,000,000 of new debt and equity financing for the Group and an allocation of the equity interests in the Parent of 50 per cent. to the participating Senior Unsecured Noteholders and 50 per cent. to a "Permitted Holder" (as defined in the Existing SSNs Indenture and the Existing FRNs Indenture) with funds managed by Advent being designated as the likely Permitted Holder for these purposes. However, on or about 22 January 2015, Advent confirmed that it did not support the SUN Proposal 1. Without Advent's support, the implementation of the SUN Proposal 1 would cause a change of control event to occur under the Existing Senior Secured Note Indentures because a "Permitted Holder" (which, as defined in the Existing Senior Secured Notes Indentures includes Advent) would no longer hold, directly or indirectly, more than 50 per cent. of the total voting powers in the Parent. As a result, the Debtor would be required to mandatorily redeem the Existing Senior Secured Notes under the terms of the Existing Senior Secured Notes Indentures. Therefore, without the support of Advent as a "Permitted Holder", (or any other Permitted Holder"), the SUN Proposal 1 was not capable of implementation without triggering a mandatory redemption of the Existing Senior Secured Notes as a result of a change of control event.

52.     Subsequently, on or about 25 January 2015 the Unsecured Ad Hoc Committee submitted a second proposal to the Debtor (the "**SUN Proposal 2**") that also included new debt and equity financing for the Group.  After careful consideration, however, the Board rejected the SUN Proposal 2 for a number of reasons, including risks surrounding litigation involving the change of control triggers under the Existing Senior Secured Note Indentures and the inability to obtain comfort from the FCA that it would consent to the proposed governance structure at the heart of the SUN Proposal 2.

**C.      Negotiations between the Debtor and the Existing Senior Secured Creditors**

53.     Set out below in the following paragraphs is an overview of the Group's negotiations with key stakeholders which ultimately led an ad hoc committee representing approximately 65 per cent. of the Existing Senior Secured Creditors (the "**Secured Ad Hoc Committee**") that was formed in November 2014 to put forward the Senior Secured Restructuring Proposal (described in Section (V)(A) below) which now forms an alternative to the Composite Restructuring Proposal (described in Section (V)(B) below). In November 2014, the Secured Ad Hoc Committee appointed Moelis & Company UK LLP as financial advisers and Sullivan & Cromwell LLP as legal advisers.

54.     Following the Q3 2014 Results Announcement, the Group and its advisers commenced discussions with the Secured Ad Hoc Committee and its advisers in order to explore the possibility of a financial restructuring of the Group that would address the unsustainable debt service obligations in respect of the Existing Senior Secured Debt and the Existing Senior Unsecured Notes, ensuring that the business of the Group could operate as a going concern in the future.

55.     The financial advisers to the Secured Ad Hoc Committee were subsequently given access to detailed financial and legal information about the Group, and such advisers had

extensive discussions and exchanged correspondence with the Group's management and its advisers.

## V.    OVERVIEW OF THE DEBTOR'S RESTRUCTURING

### A.    The Senior Secured Restructuring Proposal

56.    On 2 February 2015, the Group published the Senior Secured Restructuring Announcement, setting out that it had agreed with the Secured Ad Hoc Committee the key terms of a restructuring of the Existing Senior Secured Debt, pursuant to which the Existing Senior Secured Creditors would convert their debt claims into the Alternative New Senior Secured Notes, the New Subordinated Notes and the Alternative TopCo Shares and would have the opportunity to participate in the Alternative New Super Senior Secured Notes (each as defined below) (the "**Senior Secured Restructuring**"), to be implemented by way of a scheme of arrangement (the "**Senior Secured Restructuring Proposal**").  The key terms of the Senior Secured Restructuring Proposal are detailed in paragraphs 58 to 60 below.

### 1.    Senior Secured Lock-up Agreement – 30 January 2015

57.    The Senior Secured Restructuring Announcement also confirmed that the Debtor and the obligors under the Existing Senior Secured Debt had entered into the Senior Secured Lock-up Agreement with Existing Senior Secured Creditors holding over 70 per cent. of the total outstanding Existing Senior Secured Debt, pursuant to which such Existing Senior Secured Creditors had agreed, amongst other things, to take all actions required to implement the Senior Secured Restructuring Proposal (including voting in favour of the Senior Secured Scheme) on the terms of the Senior Secured Lock-up Agreement. No fee is proposed to be paid to Existing Senior Secured Creditors in consideration for signing the Senior Secured Lock-up Agreement.

## 2.    Terms of the Senior Secured Restructuring Proposal

58.    The Senior Secured Restructuring if required to be implemented as a result of any inability to implement the Composite Restructuring will be implemented pursuant to the Senior Secured Scheme. In summary, if the Senior Secured Restructuring is implemented, (i) each Existing Senior Secured Creditor agrees that its claims against the Debtor and the Group shall be compromised, reorganised and restructured and released and (ii) in summary terms, the business of the Group will effectively be transferred into the ownership of new holding companies (the "**Restructured Group**") which will, on the Scheme Effective Date (as that term is defined in the Senior Secured Scheme), be wholly owned by the Existing Senior Secured Creditors and which will owe reorganised and restructured senior debt liabilities and new junior debt liabilities to the Senior Secured Scheme Creditors. In addition, the New Super Senior Secured Notes will be made available to the Restructured Group.

59.    More specifically, pursuant to the Senior Secured Restructuring, amongst other things, it is intended and anticipated that (assuming approval and sanction of the Senior Secured Scheme):

(i)    a new holding structure will be established for the Existing Senior Secured Creditors, being a newly incorporated company, "**TopCo**" (wholly owned by the Existing Senior Secured Creditors), which will wholly own a newly incorporated company, "**MidCo**", which will in turn wholly own a newly incorporated company, "**FinCo**", with the initial shares in TopCo being held by a nominee;

(ii)    administrators will be appointed over the Debtor by the security agent in respect of the RCF and the Existing Senior Secured Notes (the "**Existing Security Agent**") in accordance with the provisions of the Existing Intercreditor Agreement on the instructions of the Existing Senior Secured Creditors pursuant to paragraph 14 of Schedule B1 of the Insolvency Act 1986 (as amended) (the "**Administrators**");

(iii)    the Debtor (acting by the Administrators) will procure that Towergate Insurance Limited ("**TIL**") issues a new class of ordinary voting shares to FinCo (the "**New TIL Shares**") in consideration for a nominal subscription amount from FinCo;

(iv)    the Debtor (acting by the Administrators) shall procure that the shares in TIL held by the Debtor are converted into deferred shares (the "**Deferred TIL Shares**");

(v)    in consideration for the creation of the Deferred TIL Shares (thereby increasing the value of the New TIL Shares);

    (a)    FinCo will issue £375,000,000 8.50 per cent. senior secured notes due 2020 (the "**Alternative New Senior Secured Notes**") to the Existing Security Agent, for distribution to the Existing Senior Secured Creditors, rateably in proportion to the amount of Existing Senior Secured Debt together with accrued interest up to (and including) completion of the Senior Secured Restructuring held by each Existing Senior Secured Creditor;

    (b)    MidCo will issue £150,000,000 12.00 per cent. PIK subordinated notes due 2025 (the "**New Subordinated Notes**") to the Existing Security Agent, for distribution to the Existing Senior Secured Creditors rateably in proportion to the amount of Existing Senior Secured Debt together with accrued interest up to (and including) completion of the Senior Secured Restructuring held by each Existing Senior Secured Creditor, in consideration for the issue by FinCo of shares to MidCo; and

    (c)    TopCo will issue shares in itself (the "**Alternative TopCo Shares**") to the Existing Security Agent, for distribution to the Existing Senior Secured Creditors rateably in proportion to the amount of Existing Senior Secured Debt together with accrued interest up to (and including) completion of the Senior Secured Restructuring held by each Existing Senior Secured Creditor, in consideration for the issue by MidCo of shares to TopCo;

(vi)    the Administrators will transfer the Deferred TIL Shares to a trust, whose beneficiaries are the Existing Senior Secured Creditors, in return for a nominal purchase price paid to the Debtor (in administration);

(vii)    the Existing Security Agent will distribute the Alternative New Senior Secured Notes, the New Subordinated Notes and the Alternative TopCo Shares to the Existing Senior Secured Creditors, which shall constitute a good discharge of the Existing Senior Secured Debt together with all accrued interest up to (and including) completion of the Senior Secured Restructuring;

(viii)    in connection with the sale of the Deferred TIL Shares by the Debtor (acting by the Administrators) and the issuance of the New TIL Shares, the Existing Security Agent will release the guarantees granted by certain subsidiaries of the Debtor in respect of the Existing Senior Unsecured Notes pursuant to the terms of the Existing Intercreditor Agreement;

(ix)    the Existing Senior Secured Creditors will be given the opportunity to participate in the issuance on closing of the Senior Secured Restructuring of £75,000,000

floating rate super senior secured notes due 2019 by FinCo (the "**Alternative New
Super Senior Secured Notes**"), which will be backstopped by certain of the
Existing Senior Secured Creditors; and

(x)     following the completion of the Senior Secured Restructuring, the initial shares in
TopCo held by the nominee will be repurchased by TopCo or cancelled.

60.     Certain Existing Senior Unsecured Noteholders have provided to TIL a
£20,000,000 liquidity facility pursuant to a facility agreement dated 6 February 2015 that is
guaranteed by certain of the Group's subsidiaries and repayable in the event that either the
Composite Restructuring or the Senior Secured Restructuring is implemented.

## B.     The Composite Restructuring Proposal

### 1.     Negotiations between the Existing Senior Secured Creditors and the Existing Senior Unsecured Noteholders

61.     Following further discussions between the Debtor, the Secured Ad Hoc
Committee and the Unsecured Ad Hoc Committee, the Debtor announced on 6 February 2015 in
the Composite Restructuring Announcement that certain Existing Senior Secured Creditors and
certain Existing Senior Unsecured Noteholders had agreed a restructuring of the Existing Senior
Secured Debt in tandem with a full equitisation of the Existing Senior Unsecured Notes (the
"**Composite Restructuring**"), to be implemented by way of the Senior Secured Scheme and the
Parallel Senior Unsecured Scheme (the "**Composite Restructuring Proposal**").  The Composite
Restructuring is considered preferable by the Board as it provides for the possibility of recoveries
for the Existing Senior Unsecured Noteholders, provided that the terms and conditions of the
Composite Restructuring are satisfied.

62.     In summary, the Composite Restructuring Proposal was agreed following
negotiations between (i) the Existing Senior Secured Creditors, (ii) the Existing Senior
Unsecured Noteholders and (iii) the Debtor. The Composite Restructuring Proposal facilitates
participation by the Existing Senior Unsecured Noteholders in the restructuring of the Group by

25

providing the opportunity for them to subscribe for equity in the Restructured Group. The way in which the Composite Restructuring Proposal affects the Existing Senior Secured Creditors depends upon (and is conditional upon) whether the Parallel Senior Unsecured Scheme is approved by the requisite majority of Existing Senior Unsecured Noteholders and the English Court. If the Parallel Senior Unsecured Scheme is not approved by the Existing Senior Unsecured Noteholders, or certain conditions of the Composite Restructuring are not satisfied, the Senior Secured Restructuring will be implemented (subject to the Senior Secured Scheme being approved by the Existing Senior Secured Creditors and the English Court). In such circumstances, the liabilities owed by the Debtor to the Existing Senior Unsecured Noteholders will remain outstanding from the Debtor. However, pursuant to the Senior Secured Restructuring, guarantees provided by members of the Group in respect of liabilities owed by the Debtor under the Existing Senior Unsecured Notes would be discharged in full pursuant to the terms of the Existing Intercreditor Agreement. This would enable the Restructured Group to be substantially de-leveraged following completion of the Senior Secured Restructuring.

63.     The Composite Restructuring Announcement also confirmed that (i) Existing Senior Secured Creditors holding over 75 per cent. of the total outstanding Existing Senior Secured Debt and (ii) Existing Senior Unsecured Noteholders holding approximately 65 per cent. of the total outstanding Existing Senior Unsecured Notes have entered into the Composite Lock-up Agreement, pursuant to which they have collectively agreed, amongst other things:

(i)     to take all actions required to implement the Composite Restructuring (including voting in favour of the Composite Restructuring Proposal);

(ii)    that the Composite Restructuring Proposal will proceed in parallel with the Senior Secured Restructuring Proposal;

(iii)    in the event that certain conditions to the Composite Restructuring can be met on a timely basis, that the Composite Restructuring will be implemented and the Senior Secured Restructuring will not be implemented; and

(iv)    in the event that certain conditions to the Composite Restructuring cannot be met on a timely basis or at all, that the Senior Secured Restructuring will be implemented (assuming the Existing Senior Secured Debt together with all accrued interest is not otherwise paid in full prior to completion of the Senior Secured Restructuring).

64.    It was also agreed that the Senior Secured Lock-up Agreement be amended by the parties thereto to allow for the Composite Restructuring Proposal and, if the conditions thereto are met, for the Composite Restructuring to proceed.

65.    The Debtor considers that if the conditions to the Composite Restructuring (including the Existing Senior Unsecured Noteholders satisfying the terms, conditions and milestones required in order to execute it) are satisfied and the Composite Restructuring is implemented, it is preferable to the Senior Secured Restructuring as it provides for the participation of both the Existing Senior Secured Creditors and the Existing Senior Unsecured Noteholders in a restructuring of the Group's capital structure that provides the Existing Senior Unsecured Noteholders with the opportunity to benefit from potential future upside by acquiring part of the equity in the Restructured Group and the Existing Senior Secured Creditors to benefit from the cash proceeds of subscription by the Existing Senior Unsecured Noteholders.

### 2.    Terms of the Composite Restructuring

66.    If the Composite Restructuring is implemented, it will be implemented pursuant to the Senior Secured Scheme and the Parallel Senior Unsecured Scheme. In summary, if the Composite Restructuring is implemented, (i) each Existing Senior Secured Creditor and each Existing Senior Unsecured Noteholder agrees that its claims against the Debtor and the Group shall be compromised, reorganised and restructured and/or released and (ii) in summary terms,

the business of the Group will effectively be transferred to the Restructured Group which will, on the Composite Restructuring Effective Date, be owned by both the Existing Senior Secured Creditors and the Existing Senior Unsecured Noteholders, with the Restructured Group owing new senior debt liabilities to the Senior Secured Scheme Creditors. In addition, the New Super Senior Secured Notes will be made available to the Restructured Group.

67.     More specifically, pursuant to the Composite Restructuring, amongst other things, it is intended and anticipated that (assuming approval and sanction of the Senior Secured Scheme and the Parallel Senior Unsecured Scheme):

(i)     a new holding structure will be established for the Existing Senior Secured Creditors and the Existing Senior Unsecured Creditors being TopCo, which will wholly own MidCo, which in turn will wholly own FinCo, with the initial shares in TopCo being held by a nominee;

(ii)    the Administrators will be appointed over the Debtor by the Existing Security Agent pursuant to the terms of the Existing Intercreditor Agreement and paragraph 14 of Schedule B1 of the Insolvency Act 1986 (as amended);

(iii)   the Debtor (acting by the Administrators) will procure that TIL issues the New TIL Shares to FinCo in consideration for a nominal subscription amount from FinCo;

(iv)    the Debtor (acting by the Administrators) shall procure that the shares in TIL held by the Debtor are converted into the Deferred TIL Shares;

(v)     in consideration for the release of all claims under their Existing Senior Unsecured Notes, the Existing Senior Unsecured Noteholders will:

(a)     be granted the right to subscribe indirectly (as described in (b) below) and directly for ordinary shares in TopCo (the "**TopCo Shares**") representing 80.65 per cent. of the post-restructuring share capital of TopCo for an aggregate subscription price of approximately £290.3 million, on the basis more fully described in the Post-Restructuring Equity Term Sheet (the "**SUN New Equity Rights**");

(b)     exercise their SUN New Equity Rights firstly, and as to £200,000,000, on an indirect basis via a subscription for B preference shares ("**B Preference Shares**") bearing a 15 per cent. PIK dividend and a right to dividends and distributions ranking prior to the A Shares (as defined in paragraph (c)

below) in a special purpose vehicle to be owned by the Existing Senior Unsecured Noteholders which will own 55.56 per cent. of the post-restructuring share capital of TopCo ("**SUN NewCo**"), on the basis more fully described in the Post-Restructuring Equity Term Sheet. In addition, penny warrants for 20 per cent. of the A Shares post-exercise will be stapled to the B Preference Shares, but will be detachable in the event that the B Preference Shares are redeemed in full; and

(c)     be entitled to an allocation of A ordinary shares in SUN NewCo (the "**A Shares**"), which will rank behind the B Preference Shares as to dividends and distributions and will not vote until the B Preference Shares are redeemed in full) *pro rata* to their holdings of Existing Senior Unsecured Notes save that the size of their allocation of A Shares may reduce by 75 per cent. dependent on the extent to which the SUN New Equity Rights are taken up, as more fully described in the Post-Restructuring Equity Term Sheet (the "**SUN A Share Rights**");

(vi)     in consideration for the conversion described in paragraph 67(iv) (which will increase the value of the New TIL Shares):

(a)     £250,000,000 of the proceeds of the SUN New Money Rights will be paid to the Existing Security Agent with respect to the Existing Senior Secured Debt for distribution to the Existing Senior Secured Creditors;

(b)     TopCo will distribute TopCo Shares representing 16.67 per cent. (£60,000,000) of the post-restructuring share capital of TopCo to the Existing Security Agent (the "**£60,000,000 Shares**"), for distribution to the Existing Senior Secured Creditors as follows: (1) TopCo Shares representing approximately 11.11 per cent. (£40,000,000) of the post-restructuring share capital of TopCo will be distributed rateably in proportion to the amount of Existing Senior Secured Debt held by each Existing Senior Secured Creditor; and (2) TopCo Shares representing approximately 5.56 per cent. (£20,000,000) of the post-restructuring share capital of TopCo will be distributed rateably in proportion to the amount of accrued interest owed to each Existing Senior Secured Creditor as at (and including) 1 March 2015, with such £60,000,000 Shares being issued by TopCo in consideration for the issue by MidCo of shares to TopCo;

(c)     FinCo will issue £425,000,000 8.75 per cent. senior secured notes due 2020 (the "**New Senior Secured Notes**") to the Existing Security Agent, for distribution to the Existing Senior Secured Creditors rateably in proportion to the amount of Existing Senior Secured Debt held by each Existing Senior Secured Creditor;

(vii)    the Administrators will transfer the Deferred TIL Shares to a trust, whose beneficiaries are the Existing Senior Unsecured Noteholders, in return for a nominal purchase price paid to the Debtor (in administration);

(viii)    the Existing Security Agent will distribute the New Senior Secured Notes, the £60,000,000 Shares and the proceeds of the SUN New Equity Rights to the Existing Senior Secured Creditors, which shall constitute a good discharge of the Existing Senior Secured Debt, together with an amount of accrued interest equal to £20,000,000, of which: (1) the New Senior Secured Notes, £249,980,000 of the proceeds of the SUN New Equity Rights and a portion of the £60,000,000 Shares representing £40,000,000 of the post-restructuring share capital of TopCo will be distributed to each Existing Senior Secured Creditors *pro rata* to the amount of Existing Senior Secured Debt owed to that Existing Senior Secured Creditor; and (2) £20,000 of the proceeds of the SUN New Equity Rights and a portion of the £60,000,000 Shares representing £20,000,000 of the post-restructuring share capital of TopCo will be distributed to each Existing Senior Secured Creditor *pro rata* to the amount of accrued interest on the Existing Senior Secured Debt owed to that Existing Senior Secured Creditor as at (and including) 1 March 2015;

(ix)    as regards the amount of accrued interest under the Existing Senior Secured Debt as at the date of completion of the Composite Restructuring that is in excess of £20,020,000 (being the aggregate amount of the £20,000,000 TopCo Shares and £20,000 cash distributed by the Existing Security Agent with respect to accrued interest described in paragraph 67(viii)(2) above), such amount will be paid in cash on completion of the Composite Restructuring by the Debtor to each Existing Senior Secured Creditor *pro rata* to the amount of accrued interest on the Existing Senior Secured Debt owed to that Existing Senior Secured Creditor as at (and including) the date of completion of the Composite Restructuring;

(x)    each Existing Senior Secured Creditor will be granted the right (*pro rata* to their holdings of Existing Senior Secured Debt and backstopped by funds or accounts managed or advised by HPS, as defined below) to subscribe for TopCo Shares representing an additional 2.69 per cent. of the post-restructuring share capital of TopCo for an aggregate subscription price of approximately £9.7 million, if such Existing Senior Secured Creditors are able to make certain representations and warranties described in the Scheme Documents as to their status as a "qualified investor" (which for these purposes has the meaning given to it in Directive 2003/71/EC as amended by Directive 1010/73/EU) and for both (x) a qualified institutional buyer as defined in Rule 144A under the U.S. Securities Act and (y) an accredited investor (within the meaning of Rule 501 of the Regulation D under the U.S. Securities Act) or is not acting for the benefit or account of "U.S. Persons" as defined in Regulation S of the U.S. Securities Act, in each case, on the basis more fully described in the Post-Restructuring Equity Term Sheet (together with the SUN New Equity Rights, the "**New Equity Rights**");

(xi)    the Existing Senior Secured Creditors will be given the opportunity to participate (*pro rata* to their holdings of Existing Senior Secured Debt and backstopped by certain members of the Secured Ad Hoc Committee) in the issuance on closing of the Composite Restructuring of £75,000,000 floating rate super senior secured notes due 2020 by FinCo (the "**New Super Senior Secured Notes**") if such Existing Senior Secured Creditors are able to make certain representations and warranties described in the Scheme Documents as to their status as a "qualified investor" (which for these purposes has the meaning given to it in Directive 2003/71/EC as amended by Directive 1010/73/EU) and for both (x) a qualified institutional buyer as defined in Rule 144A under the U.S. Securities Act and (y) an accredited investor (within the meaning of Rule 501 of the Regulation D under the U.S. Securities Act) or is not acting for the benefit or account of "U.S. Persons" as defined in Regulation S of the U.S. Securities Act, which in each case, which has been backstopped by certain of the Existing Senior Secured Creditors; and

(xii)   following the completion of the Composite Restructuring, the initial shares in TopCo held by the nominee will be repurchased by TopCo or cancelled.

68.    The New Equity Rights will be backstopped by certain funds or accounts managed or advised by Highbridge Principal Strategies, LLC ("**HPS**") in an amount up to £240,000,000.  In addition, KKR Credit Advisors (US) LLC, on behalf of certain funds and accounts managed or advised by it, has committed to subscribe for £40,000,000 of the SUN New Equity Rights and Sankaty Advisors, LLC, on behalf of certain funds and accounts managed or advised by it, has committed to subscribe for £20,000,000 of the SUN New Equity Rights.

69.    As mentioned in paragraph 60, certain Existing Senior Unsecured Noteholders have provided to TIL a £20,000,000 liquidity facility pursuant to a facility agreement dated 6 February 2015 that is repayable in the event that either the Composite Restructuring or the Senior Secured Restructuring is implemented.

70.    The implementation of the Composite Restructuring is conditional upon a number of consents and approvals as provided for in the Composite Lock-up Agreement, being satisfied on or before 28 April 2015, including:

(i)     any approval of the FCA of any change to the controllers or approved persons in relation to TIL and any of its regulated subsidiaries and holding companies (including without limitation direct or indirect shareholders, other security holders or directors or executive managers) that is required on the assumption that the Composite Restructuring completes; and

(ii)    any mandatory approval of any applicable anti-trust or competition authority having been obtained in connection with the Composite Restructuring.

71.     In the event that the conditions to the Composite Restructuring cannot be met on a timely basis, or at all, the Senior Secured Restructuring will be implemented through the Senior Secured Scheme (assuming the Existing Senior Secured Debt together with all accrued interest is not otherwise paid in full prior to completion of the Senior Secured Restructuring).

### C.     The Senior Secured Scheme and Transactions Contemplated By It

72.     The effect of the Senior Secured Scheme on each Existing Secured Creditor will be different depending on whether the Senior Secured Scheme implements the Composite Restructuring Proposal or the Senior Secured Restructuring Proposal. This will in turn depend on, among other things, whether the Parallel Senior Unsecured Scheme is approved and sanctioned or not.

### 1.     Implementation of the Composite Restructuring Proposal

73.     If the Senior Secured Scheme implements the Composite Restructuring, the effect will be to release and discharge the Existing Senior Secured Debt, together with all accrued interest in consideration of: (i) receipt of the £60,000,000 Shares; (ii) receipt of the New Senior Secured Notes issued by FinCo in the amount of £425,000,000; (iii) receipt of the sum of £250,000,000; and (iv) receipt of an amount of cash equal to the amount of the accrued interest over £20,020,000 up to (and including) the completion date of the Composite Restructuring, in each case *pro rata* to the amount of Existing Senior Secured Debt (but in the case of TopCo Shares representing £20,000,000 out of the £60,000,000 Shares, £20,000 of the £250,000,000

cash amount referred to in paragraph (iii) above and the cash payment referred to in paragraph (iv) above, *pro rata* to the amount of accrued interest) held by each Existing Senior Secured Scheme Creditor.

74.     Existing Senior Secured Creditor's will also have the right: (i) (*pro rata* to their holdings of Existing Senior Secured Debt and backstopped by funds or accounts managed or advised by HPS, as defined below) to subscribe for TopCo Shares representing an additional 2.69 percent. of the post-restructuring share capital of TopCo for an aggregate subscription price of approximately £9.7 million, on the basis more fully described in the Post-Restructuring Equity Term Sheet; and (ii) (*pro rata* to their holdings of Existing Senior Secured Debt and backstopped by certain members of the Secured Ad Hoc Committee) to elect to participate in the New Super Senior Secured Notes.

75.     Under the Composite Restructuring Proposal, each Existing Senior Secured Creditor and each Existing Senior Unsecured Noteholder will release any and all claims against the Towergate Partnershipco Limited, the Debtor and all subsidiaries of Towergate Partnershipco Limited (including each member of the Group immediately prior to the effective date of the restructuring), the advisers, the prospective administrators, the administrators and the ad hoc groups arising out of or in connection with the implementation of the Senior Secured Scheme, the Parallel SUN Scheme and the Composite Restructuring and (ii) any and all of their claims against any current or former director of any of the Group entities that executes a deed of release in favor of the Group and the Scheme Creditors, subject to a carveout for, among other things, fraud or wilful misconduct (the "**Scheme Releases**").[2]

---

[2]     Excerpts of each of the Scheme Releases in connection with the Composite Restructuring and the Senior Secured Restructuring are set forth on **Exhibit B** attached hereto.

### 2.    Implementation of the Senior Secured Restructuring Proposal

76.    If the Senior Secured Scheme implements the Senior Secured Restructuring, the effect will be to release and discharge the Existing Senior Secured Debt, together with all accrued interest up to (and including) the date completion of the Senior Secured Restructuring in consideration of: (i) receipt of the entire share capital in TopCo; (ii) receipt of the Alternative Senior Secured Notes issued by FinCo in an amount of £375,000,000; and (iii) receipt of the New Subordinated Notes issued by MidCo in an amount of £150,000,000, in each case *pro rata* to the amount of Existing Senior Secured Debt held by each Existing Senior Secured Scheme Creditor together with all accrued interest up to (and including) the date completion of the Senior Secured Restructuring).

77.    Existing Senior Secured Creditor's will also have the right to elect to participate (*pro rata* to their holdings of Existing Senior Secured Debt and backstopped by certain members of the Secured Ad Hoc Committee) in the Alternative New Super Senior Secured Notes.

78.    The Senior Secured Scheme itself will not affect the liabilities owed to the Existing Senior Unsecured Noteholders. However: (i) if the Composite Restructuring Proposal is implemented, the Parallel Senior Unsecured Scheme must be approved, which will compromise the rights of the Senior Unsecured Scheme Creditors as described in paragraph 81 below; or (ii) if the Senior Secured Restructuring Proposal is implemented, the contractual release of claims against the Subsidiary Guarantors held by the Existing Senior Unsecured Noteholders described in paragraph 59(viii) above will be effected pursuant to the contractual mechanics contained in clause 13.2 of the Existing Intercreditor Agreement.

79.    To the extent that U.S. securities law might be applicable to the Senior Secured Scheme and the transactions contemplated by it, I am advised that the Debtor would seek to rely on certain exemptions thereunder so as to avoid the need to register under the U.S. Securities Act

of 1933 (the "**Securities Act**"). I am further advised that one of these exemptions, which the Debtor relies upon, is pursuant to Section 3(a)(10) of the Securities Act, which applies when securities are issued in exchange for other securities, not for cash, and the fairness of the exchange is approved by a court (including a non-U.S. court) or governmental entity.

### 3.    Debt Structure of the Restructuring Group

80.    On the basis of the above, the following table illustrates the relevant indebtedness before and after completion of either Composite Restructuring or the Senior Secured Restructuring:

|  | (in millions of £) | | |
|---|---|---|---|
|  | Senior Secured Restructuring | Composite Restructuring | Composite Restructuring vs. Senior Secured Restructuring |
| New Super Senior Secured Notes | 75.0 | 75.0 | -- |
| New Senior Secured Notes | 375.0 | 425.0 | 50.0 |
| **Gross total debt** | **450.0** | **500.0** | **50.0** |
| Estimated cash at completion (post-transaction fees) | (75.6) | (111.0) | (35.4) |
| **Net total debt** | **374.4** | **389.0** | **14.6** |
| Leverage | 3.4x | 3.6x | 0.2x |

Note: the New Subordinated Notes are not included given their structurally subordinated status.

### D.    Overview of the Parallel Senior Unsecured Scheme and the Transactions Therein Contemplated

81.    The Parallel Senior Unsecured Scheme does not contain the same optionality as the Senior Secured Scheme. If the Parallel Senior Unsecured Scheme is approved, the effect will

be to release and discharge each Existing Senior Unsecured Noteholder's existing debt claims against the Debtor and its subsidiary guarantors in consideration of:

(i)      the right to subscribe indirectly (as described in (ii) below) and directly for TopCo Shares representing 80.65 per cent. of the SUN New Equity Rights;

(ii)      the ability to exercise their SUN New Equity Rights firstly, and as to £200,000,000, on an indirect basis via a subscription for B Preference Shares bearing a 15 per cent. PIK dividend and a right to dividends and distributions ranking prior to the A Shares (as defined above) in a special purpose vehicle to be wholly owned by the Existing Unsecured Noteholders which will own 55.56 per cent. of SUN NewCo, on the basis more fully described in the Post-Restructuring Equity Term Sheet. Penny warrants for 20 per cent. of the A Shares post-exercise will be stapled to the B Preference Shares but will be detachable in the event of the B Preference Shares are redeemed in full; and

(iii)      an allocation of A Shares (as defined in paragraph 67(v)(c)), *pro rata* to their holdings of Existing Senior Unsecured Notes save that the size of their allocation of A Shares may reduce by 75 per cent. dependent on the extent to which the SUN New Equity Rights are taken up, as more fully described in the Post-Restructuring Equity Term Sheet.

82.      The Parallel Senior Unsecured Scheme will be subject to customary conditions precedent in addition to receipt of any approval of the FCA of any change to the controllers or approved persons in relation to TIL and any of its regulated subsidiaries and holding companies (including without limitation direct or indirect shareholders, other security holders or directors or executive managers) that is required having been obtained.

83.      Except for the debt obligations that are contemplated to be adjusted under the Senior Secured Scheme or the Parallel Senior Unsecured Scheme, the Debtor's (and the Group's) other liabilities will be unaffected by the Schemes. The Group intends to pay and honor all outstanding obligations to their customers, vendors and employees in the ordinary course of business, including paying any trade claims as and when such claims fall due.

### E.     The Practice Statement Letters

84.     I am advised by Link DFK Limited (the "**Information Agent**") (in relation to the Existing Senior Secured Noteholders) that, at 5:00 p.m. (GMT) on 6 February 2015, the Information Agent provided the Senior Secured Scheme Practice Statement Letter ("**PSL**"), together with (i) the Alternative Equity Term Sheet, the Alternative New Super Senior Secured Notes Term Sheet, the Alternative New Senior Secured Notes Term Sheet, the New Subordinated Notes Term Sheet, the Senior Secured Intercreditor Agreement Term Sheet and the Senior Secured Restructuring Steps Plan and (ii) the Post-Restructuring Equity Term Sheet, the New Super Senior Secured Notes Term Sheet, the New Senior Secured Notes Term Sheet, the Governance Term Sheet, the Composite Intercreditor Agreement Term Sheet and the Composite Restructuring Steps Plan (the "**Ancillary Documents**"), to the Existing Senior Secured Noteholders via the clearing systems of Euroclear S.A./N.V. ("**Euroclear**") and Clearstream Banking, société anonyme ("**Clearstream**").

85.     I am advised by the Information Agent (in relation to the Existing Senior Unsecured Noteholders) that, at 5:00 p.m. (GMT) on 6 February 2015, the Information Agent provided the Parallel Senior Unsecured Scheme PSL, together with the Post-Restructuring Equity Term Sheet, the New Super Senior Secured Notes Term Sheet, the New Senior Secured Notes Term Sheet, the Governance Term Sheet, the Composite Intercreditor Agreement Term Sheet and the Composite Restructuring Steps Plan, to the Existing Senior Unsecured Noteholders via the clearing systems of Euroclear and Clearstream.

86.     I am advised by the RCF Agent (in relation to the RCF Lenders) that, at 5:17 p.m. (GMT) on 6 February 2015, the RCF Agent uploaded the Senior Secured Scheme PSL, together with the Ancillary Documents, to a website provided by DebtDomain (www.debtdomain.com), a company which specialises in providing internet-based document management interfaces, which

each RCF Lender is able to access. Shortly after uploading the Senior Secured Scheme PSL and the Ancillary Documents to the designated website provided by DebtDomain, the RCF Agent advised me that it had sent an email to each RCF Lender via the website, briefly explaining the uploaded Senior Secured Scheme PSL and the purpose for which it was being sent and containing a link to the relevant folder on the website containing the uploaded documents.

87.    The Practice Statement Letters notified the Scheme Creditors of the substance of the Schemes, outlined the Debtor's proposal for the classes of Scheme Creditors and invited any Scheme Creditors who had observations or comments to make them known for the purposes of the present hearing. Although the Debtor does not have the contact details for each Scheme Creditor, I am informed by the Information Agent and the RCF Agent that, through their respective roles, they are able to contact each Scheme Creditor either through Euroclear and Clearstream (in the case of the Existing Senior Secured Noteholders) or the DebtDomain website (in the case of the RCF Lenders), which are the ordinary authorised methods of communicating with such creditors. Therefore, I believe that all Scheme Creditors have received the relevant PSL and the Ancillary Documents.

88.    On 12 February 2015, the Information Agent and the RCF Agent circulated notices to the Senior Secured Scheme Creditors and the Senior Unsecured Scheme Creditors by way of a similar process to that outlined above informing them that the convening hearings will take place at the Rolls Building, Fetter Lane, London, EC4A 1NL at 10.30 a.m. on 26 February 2015, or as otherwise listed by the English Court. All Scheme Creditors have therefore received notice of the convening hearings and the consideration by the English Court of the application to convene the Scheme meetings.  On 18 February 2015, the Information Agent and the RCF Agent circulated further notices to the Senior Secured Scheme Creditors and the Senior Unsecured

Scheme Creditors by way of a similar process outlined above informing them that the convening

hearings will take place on 6 March 2015.

89.    As of the Petition Date, the Debtor has received no objections from any Scheme

Creditor (each of which is a sophisticated financial institution) as regards the composition of the

class under each Scheme (or indeed as regards the content of the PSLs or the Ancillary

Documents).

F.    **Timing of Implementation of the Schemes**

90.    The proposed timetable of the Schemes, subject to permission being granted by

the English Court to convene the Scheme meetings, is as follows: (i) the Scheme meetings are to

take place on 24 March 2015; and (ii) the scheme sanction hearings are to be listed with the

English Court to take place on 27 March 2015 (subject to one or both of the Schemes being

approved by the required statutory majority at the relevant Scheme meeting).

91.    I believe this timetable is fair and appropriate, giving all Scheme Creditors

sufficient time to consider the documentation. In particular:

(i)    the Group has experienced financial difficulty since October 2014. The Debtor is
a high-profile company and its discussions and negotiations with its stakeholders
and creditors have been widely reported. In order to maintain market confidence
(amongst its investors, customers and suppliers as well as its key managers and
employees) and accordingly maintain the viability of the Group's business, it is,
in the view of the Debtor's board of directors, critical that the Debtor is able to
implement either the Composite Restructuring Proposal or the Senior Secured
Restructuring Proposal within the published timeframe of the end of March 2015.
Any further loss of confidence in the market which seriously impacts upon the
viability of the Group's business could negatively impact upon the ability to
implement one of the Restructuring Proposals;

(ii)    negotiations began with the Senior Unsecured Scheme Creditors and the Senior
Secured Scheme Creditors in November 2014. The proposal from the Secured Ad
Hoc Committee to acquire the Group for the amount of the Existing Senior
Secured Debt plus £1 was submitted on 23 December 2014. Therefore, the Senior
Secured Scheme Creditors have known about the likely shape of the Senior
Restructuring Proposal for a number of months;

(iii)    discussions between the Scheme Creditors regarding the Composite Restructuring Proposal have been ongoing since 29 January 2015;

(iv)    approximately 86.2 per cent. in value of the Existing Senior Secured Creditors and approximately 86.9 per cent. in value of the Existing Senior Unsecured Noteholders have executed the Composite Lock-up Agreement and therefore have contractually agreed to support the Composite Restructuring Proposal; and

(v)    the Scheme Creditors are all, as far as I am aware, sophisticated financial institutions; and

(vi)    the Schemes do not require the Scheme Creditors to undertake any complicated or laborious tasks in order to value their vote at the Scheme meetings.

92.    Furthermore, the Debtor must also have regard to the position of the FCA, as the Group's key regulator. Any delay in implementing the Composite Restructuring or the Senior Secured Restructuring could threaten the FCA's statutory objectives, and as detailed in paragraph 18 above, the FCA has the ability in such situations to require an orderly wind-down of the business in question in order to minimise the risk to those statutory objectives. If the FCA were to impose an orderly-wind down, this would be highly value destructive for the Debtor and its subsidiaries and would have a material adverse effect on the outcome for the Debtor's creditors (including the Scheme Creditors).

93.    In summary, for the reasons outlined above, even an incremental delay to the sanctioning of the Schemes and recognition and enforcement of the Schemes by this Court may cause the timetable of the Composite Restructuring and the Senior Secured Restructuring to be extended, causing significant uncertainty for the Debtor and its directors. Any delay may also: (i) undermine market confidence (amongst the Group's investors, customers and suppliers as well as its key managers and employees), which may significantly impair the Group's ability to win and maintain business; and (ii) therefore prove value destructive for the Debtor and its

subsidiaries and represent a poorer outcome for the Debtor's creditors (including the Scheme

Creditors).

## VI.    STATEMENT PURSUANT TO SECTION 1515 OF THE BANKRUPTCY CODE

94.    I am informed that section 1515 of the Bankruptcy Code provides, in pertinent

part, as follows:

> (a)    A foreign representative applies to the court for recognition of a foreign
> proceeding in which the foreign representative has been appointed by filing a petition for recognition.
>
> (b)    A petition for recognition shall be accompanied by—
>
> (1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;
>
> (2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or
>
> (3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign and of the appointment of the foreign representative.
>
> (c)    A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

11 U.S.C. § 1515.

95.    Pursuant to section 1515(b) of the Bankruptcy Code, a copy of the Convening

Order commencing the English Proceeding is attached to the Petition as **Exhibit C**.  The

Convening Order appoints me as the Foreign Representative and authorizes me to file the

Petition and commence these chapter 15 cases.  Additionally, the Convening Order affirms the

existence of the English Proceeding.

41

96.    Pursuant to section 1515(c) of the Bankruptcy Code, I am aware of the definition

of "foreign proceeding" under section 101(23) of the Bankruptcy Code, and I believe the English

Proceeding is a "foreign proceeding" as defined therein.    I am aware of no other foreign

proceeding with respect to the Debtor.

97.    I am informed that Bankruptcy Rule 1007(a)(4) provides, as follows:

> In addition to the documents required under § 1515 of the
> Code, a foreign representative filing a petition for recognition
> under chapter 15 shall file with the petition: (A) a corporate
> ownership statement containing the information described in
> Rule 7007.1; and (B) unless the court orders otherwise, a list
> containing the names and addresses of all persons or bodies
> authorized to administer foreign proceedings of the debtor, all
> parties to litigation pending in the United States in which the
> debtor is a party at the time of the filing of the petition, and all
> entities against whom provisional relief is being sought under
> § 1519 of the Code.

Fed. R. Bankr. P. 1007(a)(4).

98.    I am further informed that Bankruptcy Rule 7007.1 provides in pertinent part that

a corporate ownership statement:

> . . . identif[y] any corporation, other than a governmental unit,
> that directly or indirectly owns 10% or more of any class of the
> corporation's equity interests, or states that there are no entities
> to report under this subdivision.

Fed. R. Bankr. P. 7007.1(a).

**A.    Corporate Ownership Statement**

99.    In compliance with the requirements of Bankruptcy Rule 1007(a)(4)(A), the

following is a corporate ownership statement of the Debtor, which identifies any corporation that

directly or indirectly owns 10% or more of any class of the Debtor's equity interests:

- Towergate Holdings II Limited, Towergate Partnership Limited, Towergate
  PartnershipCo Limited and funds managed by Advent International Corporation
  and its affiliates each directly or indirectly owns 100% of the Debtor.

For the Bankruptcy Court's convenience, a corporate chart is attached as **Exhibit A** hereto.[3]

### B. List of Administrators

100. In compliance with the requirements of Bankruptcy Rule 1007(a)(4)(B), the Debtor, as directed by its Board, shall maintain control of and be authorized to administer the English Proceeding. The service address for the Debtor in this chapter 15 case is: Towergate Finance plc, Towergate House, Eclipse Park, Sittingbourne Road, Maidstone, Kent, England ME14 3EN; Attention: Scott Egan. I am aware of no other persons or bodies authorized to administer the English Proceeding.[4]

### C. Litigation Parties in the United States

101. As of the Petition Date, the Debtor is not a party to any pending litigation in the United States.

### D. Entities Against Whom Provisional Relief Is Being Sought Under Section 1519 of the Bankruptcy Code.

102. The Debtor is not seeking provisional relief pursuant to section 1519 of the Bankruptcy Code against any entities.[5]

*[Remainder of page intentionally left blank]*

---

[3]    As indicated on the corporate chart, it does not purport to depict all of the entities that comprise the Group.

[4]    As described in paragraph 59, administrators will be appointed over the Debtor by the Existing Security Agent in connection with the implementation of the Senior Secured Restructuring. The Debtor is not seeking at this time recognition of the administration proceeding over the Debtor, nor does it believe that it presently needs any relief in connection with the administration. To the extent that relief is necessary to aid in the implementation of such administration, it will be subject to a separate motion.

[5]    While the Debtor is not presently seeking provisional relief pursuant to section 1519 of the Bankruptcy Code, the Debtor reserves its right to do so in the future should the need arise. If the Debtor does seek such provisional relief in the future, the Debtor will file a list of all such parties against whom it is seeking such relief at that time.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information and belief.

Executed:     London, England
              6 March 2015

_____
Scott Egan
Interim Chief Executive Officer