Paul Hessler
Aaron Javian
Robert H. Trust
LINKLATERS LLP
1345 Avenue of the Americas
New York, NY 10105
(212) 903 9000 (Tel)
(212) 903 9100 (Fax)

Counsel to Scott Egan
as Petitioner and Foreign Representative

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re* | Chapter 15 |
| Towergate Finance plc, | Case No. 15-_____(____) |
| Debtor in a foreign proceeding. | |

## DECLARATION OF BRUCE BELL IN SUPPORT OF VERIFIED PETITION UNDER CHAPTER 15 FOR RECOGNITION OF A FOREIGN MAIN PROCEEDING AND OTHER RELIEF

I, Bruce Bell, declare under penalty of perjury as follows to the best of my knowledge, information, and belief:

1.    I am a solicitor duly admitted to practice in England and Wales and a partner in the law firm of Linklaters LLP, located at One Silk Street, London, EC2Y 8HQ United Kingdom.  I submit this declaration (the "**Declaration**") in support of the Verified Petition under Chapter 15 for Recognition of a Foreign Main Proceeding and Other Relief (together with the Form of Voluntary Petition filed contemporaneously herewith, the "**Petition**") filed in the above-

captioned chapter 15 case.[1]  The Petition seeks, among other relief, chapter 15 recognition of two separate but related schemes of arrangement (each a "**Scheme**" and, together, the "**Schemes**") proposed by Towergate Finance plc (the "**Debtor**"), a company incorporated in England and Wales, to its Scheme Creditors (as defined in paragraph 2 below) under part 26 of the Companies Act 2006 of England & Wales (the "**Companies Act**") to the extent that such Schemes are duly approved by the requisite majority of affected creditors and sanctioned by the High Court, all in accordance with applicable English law. As of the date hereof, the Schemes are pending (the "**English Proceeding**") before the High Court of Justice, Chancery Division, Companies Court sitting in London, England (the "**High Court**").

2.      As set forth in more detail in the Petition, the Schemes encompass two separate restructuring proposals: the first is known as the "**Composite Restructuring**," which will implement, through the two separate Schemes, the restructuring of certain obligations owed to senior secured noteholders (the "**Existing Senior Noteholders**"), senior secured lenders (the "**RCF Lenders**", together with the Existing Senior Noteholders, the "**Existing Senior Secured Creditors**") and senior unsecured noteholders (the "**Existing Senior Unsecured Noteholders**"; together with the Senior Secured Creditors, the "**Scheme Creditors**") as long as the requisite majorities of each of the affected Existing Senior Secured Creditors and Existing Senior Unsecured Noteholders vote for the relevant Scheme and certain conditions precedent are satisfied; and the second is known as the "**Senior Secured Restructuring**," a fallback to the Composite Restructuring, which will implement, through the Secured Scheme (as defined in paragraph 11 below) only and by operation of certain pre-existing contractual intercreditor terms to which all of the Scheme Creditors are subject, a restructuring of certain obligations held by the

---

[1]      Capitalized terms used but not defined herein shall have the meaning ascribed in the Petition.

Existing Senior Secured Creditors as long as the requisite majority of the affected Existing Senior Secured Creditors vote for the Secured Scheme and certain conditions precedent are satisfied. The Debtor will seek to implement the Senior Secured Restructuring and not the Composite Restructuring only if the Unsecured Scheme (as defined in paragraph 11 below) is not approved by the requisite majority of the Existing Senior Unsecured Noteholders or the Unsecured Scheme otherwise fails by reference to the terms applicable to it (for example, because any of its conditions precedent are not satisfied). In brief, the Schemes are the key component of the Debtor's goal to implement a financial restructuring of its existing debt obligations.

3.      In this Declaration, after describing my background and qualifications, I provide a description of English law and practice relevant to this Court's consideration of the Petition.  I also wish to advise this Court of the procedures and schedule of events relating to the Schemes underway with respect to the Debtor.

4.      In preparing this Declaration, I have reviewed (i) the Petition and (ii) relevant provisions of the Companies Act, the Insolvency Act 1986 and other relevant provisions of English and EU law as I consider may relate to chapter 15 and other aspects of U.S. bankruptcy law.

## PROFESSIONAL BACKGROUND AND QUALIFICATIONS

5.      Relevant aspects of my legal background are as follows: I earned my undergraduate bachelor of arts degree from Pembroke College at the University of Cambridge in 1994, and I subsequently undertook a post-graduate Diploma in Law at the City University, London in 1995 and a post-graduate Diploma in Legal Practice at the College of Law, London in 1996.  I undertook my solicitor's training contract with the firm of Wilde Sapte between 1996 and 1998 and was admitted to practice as a solicitor of the higher courts of England and Wales

on 15 September 1998.  I am a partner in the Restructuring and Insolvency group in the London office of Linklaters LLP, and have concentrated on domestic and cross-border restructuring and insolvency legal practice since my qualification in 1998.

6.      I have considerable experience in matters related to English insolvency law. In particular, I have advised debtors, creditors and insolvency practitioners in a significant number of formal insolvency proceedings, out-of-court  restructurings and other related matters. I have advised a number of debtor companies on the proposal of schemes of arrangement to their creditors under the Companies Act.

7.      I, together with other partners and associates in my firm, have been advising the Debtor and its subsidiaries on all legal aspects of the Debtor's restructuring, conduct of the Schemes and the extraterritorial effects and recognition of the same since October 2014. [2]

## STATEMENTS ON ENGLISH LAW AND PRACTICE

8.      A scheme of arrangement is a proceeding under the laws of England and Wales that allows a company to effect compromises or arrangements, including by way of restructuring debt liabilities, with their members (i.e. shareholders) or creditors (or any class of them).  One of the uses for schemes of arrangement is the restructuring of debts of companies that are in financial distress, even if those companies are not, in fact, insolvent or in a formal insolvency process.  Schemes are particularly useful in circumstances in which hold-out creditors seek an advantage as against similarly ranked creditors in work-out negotiations, as they enable companies and their creditors in certain instances to obtain court sanction to effect restructuring measures without having to obtain approval from 100% of affected creditors.  Such schemes of arrangement are often referred to as "creditor schemes" to distinguish them from schemes

---

[2] The information concerning the Schemes provided herein is drawn either from public documents or from my personal knowledge.  Furthermore, I have not relied on any confidential attorney-client communications or on confidential documents prepared in anticipation of litigation.

4

relating to shareholders ("member schemes"). As the Schemes proposed by the Debtor in the English Proceeding relate only to certain classes of its creditors, the remainder of this Declaration will refer to schemes only in that context.

9.      Sections 895 to 899 of the Companies Act permit a "compromise or arrangement" (commonly, a "scheme of arrangement" or "scheme") to be proposed between a company and its creditors or any class of them.  Attached hereto as **Exhibit A** is a true copy of Sections 895 to 899 of the Companies Act. A scheme must be a genuine and effective arrangement or compromise.  There must be some sort of advantage gained by those creditors of the company that participate in the scheme that compensates them for the scheme's alteration of their rights. A proposal that simply seeks to expropriate the rights of creditors cannot be a compromise or arrangement within the meaning of the Companies Act.

10.     A creditor scheme can be initiated by the debtor company applying to the High Court in England for permission to convene a meeting of the relevant creditors whose rights will be affected by the creditor scheme (commonly known as "scheme creditors") to consider and vote on whether to approve the creditor scheme.  The hearing to consider this application is commonly referred to as the "convening hearing."  In accordance with the Practice Statement of the High Court dated April 15, 2002, the debtor should give notice of the intended promotion of the scheme to all such scheme creditors so as to give them the opportunity of attending the initial hearing to raise any objections related to the proposed classification of the affected scheme creditors or any issues relating to the jurisdiction of the High Court to hear the scheme.  In this case, on or about 6 February 2015, Link DFK Limited (the "**Information Agent**") via the clearing systems of Euroclear S.A./N.V. ("**Euroclear**") and Clearstream Banking, *société anonyme* ("**Clearstream**") provided (i) a Practice Statement Letter along with the applicable

term sheets, steps plans and other documents relating to the Senior Secured Scheme (the "**Senior Secured Scheme PSL**") to the Existing Senior Noteholders and (ii) a Practice Statement Letter along with the applicable terms sheets, steps plans and other documents relating to the Parallel Senior Unsecured Scheme (the "**Parallel Senior Unsecured Scheme PSL**") to the Existing Senior Unsecured Noteholders.  Lloyds Bank plc as the agent of the revolving credit facility agreement under which the RCF Lenders loaned money to the Debtor provided the Senior Secured Scheme PSL to the RCF Lenders via a website provided by DebtDomain (www.debtdomain.com), a company which specialises in providing internet-based document management interfaces, which each RCF Lender is able to access.  A copy of the Senior Secured Scheme PSL and the Parallel Senior Unsecured Scheme PSL are attached hereto as **Exhibits B and C**.

11.    Classification of the affected scheme creditors is an important consideration for the High Court.  Each class of creditors included within the scheme is required to approve the scheme.  The class test is based on similarity or dissimilarity of legal rights against the debtor company, both as they exist before the scheme and afterwards.  The class test is not based upon a similarity of economic interests or objectives.  Creditors whose rights are so dissimilar that they cannot sensibly consult together with a view to their common interest must be placed into separate classes for voting purposes and must be given separate meetings to consider and vote on the scheme. The Debtor has proposed two Schemes:

(a) a scheme of arrangement in relation to the Existing Senior Secured Creditors (the "**Secured Scheme**"); and

(b) a scheme of arrangement in relation to the Existing Senior Unsecured Noteholders (the "**Unsecured Scheme**").

6

12.    In this case each Scheme has only one class of creditors. Only the Existing Senior Secured Creditors are entitled to attend the Secured Scheme creditors' meeting and vote on the Secured Scheme, and only the Existing Senior Unsecured Noteholders are entitled to attend the Unsecured Scheme creditors' meeting and vote on the Unsecured Scheme.[3] The Debtor has proposed two separate Schemes because if a single Scheme had been proposed and the Existing Senior Secured Creditors and the Existing Senior Unsecured Noteholders were placed in separate classes within the same scheme, if one of those classes did not approve such scheme, the Debtor would be prevented from implementing the Composite Restructuring or the Senior Secured Restructuring. By proposing separate Schemes, even if the Existing Senior Unsecured Noteholders do not approve the Unsecured Scheme, the Debtor can still implement the Senior Secured Restructuring if the Existing Senior Secured Creditors approve the Secured Scheme and certain conditions precedent are satisfied.

13.    When deciding whether to give permission to convene the creditors' meetings, the High Court will also consider whether it has jurisdiction over the scheme company. Section 895(2)(b) of the Companies Act defines those companies which can be subject to a scheme of arrangement.  It provides that for the purposes of sections 895 to 899 of the Companies Act, a "company" means "any company liable to be wound up under the Insolvency Act 1986."  The Debtor is a company that was formed and registered under the Companies Act.  Part IV of the Insolvency Act 1986 provides the statutory basis pursuant to which companies that are formed and registered under the Companies Act can be wound up by the English courts and the Debtor is such a company. Accordingly,  the English courts have prima facie jurisdiction to wind the Debtor up. Finally, the High Court will also consider whether there is any reason why it should

---

[3] There is no difference in treatment between Scheme Creditors in either of the Schemes by reference to their jurisdiction of incorporation or domicile.

not exercise its discretion to order the convening of the requested meetings, for example by reference to reasons of public policy.

14.    Once permission to convene the scheme meetings has been granted by the High Court, the Debtor will then send notice of the scheme meetings and an explanatory statement (which will include the terms of each Scheme) to all Scheme Creditors.  Section 897 of the Companies Act sets out what information must be contained in the explanatory statement.  The explanatory statement must contain a sufficient explanation of the effect of the compromise or arrangement for a typical creditor whose claim is being affected by the terms of the scheme to make a reasonable decision about whether or not to support the scheme.

15.    After an appropriate period approved by the High Court, the meetings of scheme creditors will be held. Here, the scheme meetings are to be held on 24 March 2015.  The Secured Scheme will be considered approved at a creditors' meeting (which all Existing Senior Secured Creditors are entitled to attend and ask questions about the Secured Scheme) only if it is supported by a simple majority by number of the Existing Senior Secured Creditors present and voting (including by way of proxy) and representing at least 75% by value (i.e., amount of the claims) of Existing Senior Secured Creditors present in person or by proxy and voting on the Secured Scheme.  The Unsecured Scheme will be considered approved at a creditors' meeting (which all Existing Senior Unsecured Noteholders are entitled to attend and ask questions about the Unsecured Scheme) only if it is supported by a simple majority by number of the Existing Senior Unsecured Noteholders present and voting (including by way of proxy) and representing at least 75% by value (i.e., amount of the claims) of Existing Senior Unsecured Noteholders present in person or by proxy and voting on the Unsecured Scheme.

8

16.    The voting tallies are not required to be scrutinized or confirmed by an independent third party (it being the duty of the chairman to report to the High Court on the outcome of the relevant meeting) but in this case, they will be scrutinized by the Information Agent.

17.    If the meetings result in the approval of the Secured Scheme and/or the Unsecured Scheme by the relevant Scheme Creditors, the Debtor will apply for the High Court to sanction the Scheme(s) at a further hearing of the High Court (commonly known as the "sanction hearing"). The explanatory statement would normally include the proposed date for the sanction hearing, and the High Court will publish the hearing times of cases heard before it on its website. Scheme Creditors and other interested persons may appear in person or by counsel and be heard, raise objections and present evidence at the sanction hearing.

18.    The sanction hearing is not a mere formality. The High Court has discretion as to whether to sanction the Schemes, and it can hear arguments at this stage both from the Scheme Creditors whose rights would be overtly affected by such Scheme and from other persons whose rights were not overtly affected but who claim they would be prejudiced by such Scheme if it were sanctioned. In particular, the High Court will examine whether (a) the Companies Act requirements have been satisfied; (b) the Scheme Creditors subject to such Scheme were fairly represented by those who attended the meeting, and the requisite majorities are acting in good faith and are not coercing the minority in order to promote interests that are collateral or different to those of the class of Scheme Creditors in general; and (c) the arrangement is such that an intelligent and honest man, a member of the class of Scheme Creditors concerned and acting in respect of his own interest, might reasonably approve.

19.    When considering whether to sanction the Schemes, the High Court will not substitute its own commercial view on the terms of Schemes for the views of the Scheme Creditors as the High Court considers that such commercial decisions are best made by those whose commercial interests are at stake but the High Court is concerned as to whether the terms are such that Existing Senior Secured Creditors or Existing Senior Unsecured Noteholders, as applicable, could reasonably approve them.    If the High Court thinks that ulterior motives influenced the approval, it may decide not to sanction such Scheme(s).    However, if the Schemes appear to the High Court to be ostensibly fair, then the High Court will not otherwise judge their commercial merit.

20.    If sanctioned by the High Court, each Scheme will become effective once a certified copy of the High Court's order approving such Scheme has been submitted to the Registrar of Companies for England and Wales, and in accordance with the provisions of such Scheme itself.  Each of the Existing Senior Secured Creditors and the Existing Senior Unsecured Noteholders will be bound by the relevant Scheme, whether or not a particular Existing Senior Secured Creditor or Existing Senior Unsecured Noteholder, as applicable, participated in the applicable creditors' meeting or voted in favour of such Scheme.    A creditor's scheme often includes detailed mechanics by which the compromised claims of scheme creditors are settled after the scheme becomes effective.

21.    It is well established that a company through an English scheme may cause the release of third-party rights and obligations  that are reasonably connected to the scheme and the facts and circumstances giving rise to it. In accordance with the applicable case law, the High Court will only consider the release of claims which:

(a) are closely connected with the Scheme Creditors' rights as creditors against the

10

scheme company;

(b) are personal and not proprietary rights;

(c) if exercised and leading to a payment by the third-party guarantor, would result in a reduction of the Scheme Creditors' claims against the company; and

(d) are "necessary and ancillary" to the scheme (which would almost always exclude the release of liabilities arising from fraud or wilful misconduct).

22.     These stringent tests ensure that the ability to release third-party claims through a scheme is appropriately circumscribed, unlikely to be exploited or abused, and within the jurisdiction of the High Court. In this case, these tests are met. Here, in the event that the Composite Restructuring is implemented by way of the Secured Scheme and the Unsecured Scheme, each of the Existing Senior Secured Creditor and each Existing Senior Unsecured Noteholder (each in their capacity as such) will release (pursuant to the relevant Scheme) any and all claims against Towergate Partnershipco Limited (which is the Debtor's ultimate holding company), the Debtor and all subsidiaries of Towergate Partnershipco Limited (including each member of the Group immediately prior to the effective date of the restructuring), the advisers (in their capacity as such), the prospective administrators (in their capacity as such), the administrators (in their capacity as such), the ad hoc groups (in their capacity as such), any current or former director of any of the Group entities that executes a deed of release in favour of the Group and the Scheme Creditors, the Information Agent (in its capacity as such), the existing senior secured notes trustee (in its capacity as such), the new notes trustee (in its capacity as such), the existing security agent (in its capacity as such), the new security agent (in its capacity as such), the escrow and settlement agent (in its capacity as such) and any other Scheme Creditor (or its Nominated Recipient(s) and/or Nominated Participant(s) each as defined in the

explanatory statement)  or such Scheme Creditor's affiliated entities in relation to or arising out of or in connection with the Scheme Claims (as defined in the explanatory statement), and/or the negotiation and the implementation of the Senior Secured Scheme (in respect of the Existing Senior Secured Creditors only), the Parallel SUN Scheme (in respect of the Existing Senior Unsecured Noteholders only) and the Composite Restructuring, subject to a carve-out for, among other things, fraud or wilful misconduct (the "**Scheme Releases**").

23.     The Scheme Releases are broadly consistent with previous like releases approved by the High Court in similar circumstances and are necessary and ancillary to each Scheme because they form an integral part of the bargain between the Debtor and the Scheme Creditors so as to achieve a consensual resolution of the financial difficulties of the Debtor, without recourse to an unplanned and non-consensual insolvency process.

24.     The convening hearing took place before the High Court on 6 March 2015.  The High Court granted the relief sought by the Debtor, (a) ordering that it convene meetings of its Scheme Creditors for 24 March 2015, to consider and vote upon the Schemes and (b) approving the appointment of the Foreign Representative.  A copy of the orders made by the High Court at the convening hearing is attached hereto as **Exhibit D**.

[*Remainder of page intentionally left blank*.]

## CONCLUSION

I declare under penalty of perjury under the laws of the United States of

America that the foregoing is true and correct.

Executed on this 6th day of March, 2015

In London, United Kingdom

Bruce Bell

Partner, Linklaters LLP